[Cite as *State v. Sutton*, 2022-Ohio-2452.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                CASE NO.  13-21-11

     v.

JERON D. SUTTON,                      **O P I N I O N**

     DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 19 CR 0235

**Judgment Affirmed**

**Date of Decision:   July 18, 2022**

APPEARANCES:

    *Kimberly Kendall Corral* **for Appellant**

    *Derek W. DeVine* **for Appellee**

**MILLER, J.**

{¶1} Defendant-appellant, Jeron D. Sutton, appeals the June 30, 2021 judgment of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

## I. Background

{¶2} On December 19, 2019, the Seneca County Grand Jury indicted Sutton on five counts: Count One of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony; Count Two of aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; Count Three of murder in violation of R.C. 2903.02(B), an unclassified felony; Count Four of having weapons while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony; and Count Five of attempted murder in violation of R.C. 2923.02(A) and 2903.02(A), a first-degree felony. Counts One, Two, Three, and Five each included a three-year firearm specification. On January 9, 2020, Sutton appeared for arraignment and pleaded not guilty to the counts and specifications of the indictment.

{¶3} At arraignment, Sutton was represented by appointed counsel. However, Sutton subsequently retained counsel, who entered a notice of appearance on January 22, 2020. This attorney represented Sutton until September 2020, when the trial court permitted him to withdraw. In place of his first retained attorney,

Sutton secured the services of two substitute attorneys. These two attorneys entered a notice of appearance on September 17, 2020.

{¶4} A jury trial was originally scheduled to begin on July 6, 2020, but upon Sutton's motion, the trial was continued until October 5, 2020. Because of Sutton's substitution of counsel, the jury trial was then continued again until January 25, 2021. Thereafter, the trial was continued to April 12, 2021, and then once more for a final time to June 7, 2021. In its March 19, 2021 order continuing the jury trial to June 7, 2021, the trial court indicated that it would "not accept another continuance in this case." (Doc. No. 65).

{¶5} On the morning of June 7, 2021, Sutton appeared before the trial court and waived his right to trial by jury. The matter then proceeded to a bench trial.

{¶6} At Sutton's trial, Raul Badillo testified that he was at his home in Fostoria, Ohio on the evening of October 19, 2019. (June 8, 2021 Tr. at 145-147). Badillo stated he and his girlfriend, Madison McCarthy, were watching Netflix in an upstairs bedroom when at approximately 9:30 p.m., he received a phone call from a number he did not recognize. (June 8, 2021 Tr. at 145-149, 163). Badillo stated that he answered the call but he did not recognize the voice of the male caller. (June 8, 2021 Tr. at 149, 163). The caller said he had been given Badillo's phone number by a person whose name Badillo heard as "Tyree" or "Tyrell." (June 8, 2021 Tr. at 149, 163). The caller indicated that "Tyree" or "Tyrell" told him that he could buy

marijuana from Badillo. (June 8, 2021 Tr. at 149, 163). Badillo testified that he quickly ended the phone call because he did not know the caller. (June 8, 2021 Tr. at 149, 163).

{¶7} According to Badillo, a short time later, between 11:00 p.m. and 11:30 p.m., his dog "started barking like crazy." (June 8, 2021 Tr. at 148). Badillo stated he went downstairs to quiet his dog and then looked outside through his kitchen window. (June 8, 2021 Tr. at 148). As he was doing so, two men, dressed in "all black with black hoodies on tied up into little circles," burst through his backdoor. (June 8, 2021 Tr. at 148, 151). Badillo testified the two intruders were armed with handguns and that they immediately began firing at him. (June 8, 2021 Tr. at 151). Badillo said he confronted the foremost intruder and began struggling with the intruder. (June 8, 2021 Tr. at 151-152). Badillo stated that after fighting for approximately 30 seconds, he wrested the gun away from the first intruder and shot him once in the head, killing him. (June 8, 2021 Tr. at 152, 158). Badillo testified he then noticed the second intruder had fled from the house. (June 8, 2021 Tr. at 152, 158-159). Badillo also realized he had been shot in his right shoulder at some point during the fight with the first intruder. (June 8, 2021 Tr. at 154-155). Badillo was insistent in his belief that it was the second intruder who shot him. (June 8, 2021 Tr. at 154-155).

{¶8} After calling 911, Badillo was taken to the hospital to receive treatment for his gunshot wound. While at the hospital, Badillo spoke to Detective Brandon Bell of the Fostoria Police Department. Detective Bell testified that Badillo informed him that he believed his friend, Tyree Tucker, might be the man who he shot. (June 8, 2021 Tr. at 211). However, according to Detective Bell, when he showed Badillo a picture of the deceased intruder, Badillo ruled out Tucker and stated that he did not recognize the man. (June 8, 2021 Tr. at 211). As for the second intruder, Badillo testified that the second intruder was a black male, that he was more than six feet tall, and that he was not fat or "super big," but he could not identify him. (June 8, 2021 Tr. at 165-166). Nor could McCarthy identify the second intruder. Although McCarthy testified that she saw someone running away from her and Badillo's home, she could not say how tall the person was or how much they weighed. (June 8, 2021 Tr. at 177-178). She could say only that the person was dressed in dark-colored clothing. (June 8, 2021 Tr. at 178).

{¶9} While speaking with Detective Bell, Badillo also mentioned the phone call he had received before the break-in. Detective Bell testified that the following morning, he extracted data from Badillo's cell phone showing that Badillo received a phone call from a number ending in 1110 approximately one and a half hours before the break-in. (June 8, 2021 Tr. at 212). This data confirmed Badillo's

statement and established the exact time and duration of the phone call Badillo received from the 1110 number prior to the break-in. (June 8, 2021 Tr. at 161-162).

{¶10} The focus of the investigation then shifted to identifying the deceased intruder. To that end, an autopsy was conducted on October 22, 2019. (June 8, 2021 Tr. at 213-214). At the autopsy, a bulletproof vest was removed from the body of the deceased intruder. (June 8, 2021 Tr. at 214). From his fingerprints, the deceased intruder was identified as Christopher Cavaness. (June 8, 2021 Tr. at 215, 218). According to Detective Bell, the identification was made either later in the day on October 22, 2019, or on October 23, 2019. (June 8, 2021 Tr. at 217-218). Detective Bell testified that after Cavaness's identity had been established, he went about determining where Cavaness lived and who might have seen him last. (June 8, 2021 Tr. at 218). He stated that during this phase of the investigation, he learned from the Toledo Police Department that Cavaness's fiancé, Deanna Murdock, had reported Cavaness missing on October 22, 2019. (June 8, 2021 Tr. at 218).

{¶11} Murdock's missing-person report indicated that Cavaness had been with Sutton on the evening of October 19, 2019. (State's Ex. 13). Murdock confirmed this at Sutton's trial, testifying that at approximately 8:30 p.m. on October 19, 2019, Cavaness left their shared apartment after indicating that Sutton was coming to pick him up. (June 8, 2021 Tr. at 184-185). She testified the two men had been friends for at least eight years and perhaps since high school. (June

8, 2021 Tr. at 183). She stated that Cavaness did not take his own car when he left. (June 8, 2021 Tr. at 185). Murdock further testified that when Cavaness failed to return home on October 20, 2019, she called Sutton, who told her that he had dropped Cavaness off at a gas station in Toledo at approximately 10:30 p.m. the previous evening. (June 8, 2021 Tr. at 189).

{¶12} After learning that Cavaness had been reported missing, Detective Bell drove to Toledo to speak to Murdock on October 23, 2019. Detective Bell testified that after notifying Murdock of Cavaness's death, he asked Murdock whether she would be willing to participate in a controlled phone call with Sutton. (June 8, 2021 Tr. at 219-220). Murdock agreed, and she placed a call to a phone number ending in 1109, which she knew Sutton to use. (June 8, 2021 Tr. at 191-192, 219-220). Detective Bell stated that although Sutton did not answer, Sutton soon returned Murdock's call. (June 8, 2021 Tr. at 220). According to Detective Bell, during the course of Sutton and Murdock's conversation, Sutton acknowledged that the 1110 number—the number that called Badillo's cell phone on the night of October 19, 2019—was his "other number." (June 8, 2021 Tr. at 221-222). Detective Bell testified that he then directed search warrants to Sutton's and Cavaness's cellular service providers and obtained call records and tower data for Sutton's 1109 number, Sutton's 1110 number, and Cavaness's cell phone number. (June 8, 2021 Tr. at 222).

{¶13} On October 25, 2019, Sutton voluntarily appeared at the headquarters of the Toledo Police Department for an interview with Detective Bell. (June 8, 2021 Tr. at 224-225). According to Detective Bell, Sutton confirmed during the interview that he used both the 1109 number and the 1110 number. (June 8, 2021 Tr. at 226). In addition, Sutton claimed he was in possession of both cell phones for the entirety of October 19-20, 2019. (June 8, 2021 Tr. at 228). Detective Bell stated that when he asked Sutton whether he had been to Fostoria on October 19, 2019, Sutton "became kind of agitated that [he] was asking him such questions. He essentially denied ever coming to the City of Fostoria on October 19th." (June 8, 2021 Tr. at 227). Detective Bell also testified that Sutton gave the following account of his contacts with Cavaness on October 19, 2019:

> [Sutton] said that he made contact with [Cavaness], who was at home. He went to [Cavaness's] residence on Hill Avenue. Picked him up approximately 8:30. They then went to a property that Mr. Sutton and his father I believe were rehabbing, and [Cavaness] was going to do some work there. They were there for approximately 45 minutes to an hour, and then he dropped him off in the area of Hawley and Gordon * * * in the City of Toledo.

(June 8, 2021 Tr. at 227). At the conclusion of the interview, Detective Bell took Sutton's cell phone, which was associated with the 1109 number, as well as the size 12 Jordan basketball shoes Sutton was wearing during the interview. (June 8, 2021 Tr. at 229-230); (State's Exs. 7, 11).

{¶14} Detective Bell then approached Sergeant Vanessa Gazarek, a criminal analyst assigned to the METRICH Drug Enforcement Unit, to assist in the investigation. Sergeant Gazarek testified that part of her work as a criminal analyst involved cell phones and cell phone towers. (June 7, 2021 Tr. at 93). She stated that she is trained and certified in multiple forensic software tools, including Cellebrite, which she described as "an analysis tool to download cell phones or computers to analyze the data that's held within the device," and "CASTViz,"[1] which she described as "FBI * * * mapping software for cell phone data." (June 7, 2021 Tr. at 95-96).

{¶15} Sergeant Gazarek testified that Detective Bell provided her with the call records and tower data obtained from Sutton's and Cavaness's cellular service providers. (June 7, 2021 Tr. at 97-98). Sergeant Gazarek stated that she input the call records and tower data for Sutton's 1109 number, Sutton's 1110 number, and Cavaness's cell phone number into the CASTViz program and generated several maps. (June 7, 2021 Tr. at 97-98). These maps, admitted at Sutton's trial as State's Exhibits 9A-9G, list the calls made and received by Sutton's and Cavaness's cell phones and depict the geographical locations of the cell towers that were "pinged"

---

[1] In the trial transcript, this program is referred to as "Castbiz." (June 7, 2021 Tr. at 95-96). This appears to have been an error. *See State v. Cultrona*, 5th Dist. Tuscarawas No. 2019 AP 06 0019, 2020-Ohio-3250, ¶ 11 (referring to an FBI cell-data mapping program called "Castviz"); *see also* CASTViz Online, https://castviz.com/ (accessed June 7, 2022) (featuring the tagline "Cellular analysis, visualized").

by each of the calls. Sergeant Gazarek testified that State's Exhibits 9A-9G feature every phone call for which she had data.

{¶16} State's Exhibits 9C and 9F show the calls made and received by the cell phones associated with Sutton's 1110 number ("Sutton's 1110 phone") and 1109 number ("Sutton's 1109 phone"), respectively, between 2:00 p.m. and 6:00 p.m. on October 19, 2019. Shortly after 2:00 p.m., both of Sutton's cell phones pinged cell towers in the Toledo area. However, between 2:32 p.m. and 3:36 p.m., Sutton's 1110 phone pinged a cell tower located near Badillo's residence in Fostoria a total of 4 times. Then, between 4:30 p.m. and 4:47 p.m., Sutton's 1109 phone twice pinged a cell tower located near Badillo's residence. Thereafter, both of Sutton's cell phones pinged various towers located north and northwest of Fostoria until approximately 5:38 p.m., at which time both cell phones were again pinging towers in the Toledo area. While discussing State's Exhibit 9C at Sutton's trial, Sergeant Gazarek agreed that it was "accurate to say that * * * by following the times, [it appeared] that [Sutton's 1110 phone] traveled from the Toledo area to the Fostoria area and then back to Toledo" between 2:00 p.m. and 6:00 p.m. on October 19, 2019. (June 7, 2021 Tr. at 106).

{¶17} State's Exhibits 9A, 9D, and 9G show the calls made and received by Cavaness's cell phone, Sutton's 1110 phone, and Sutton's 1109 phone, respectively, between 8:00 p.m. on October 19, 2019, and 5:00 a.m. on October 20, 2019.

Between 8:02 p.m. and 8:59 p.m., Cavaness's and Sutton's cell phones pinged various towers located throughout the Toledo area. These included 4 calls to Cavaness's cell phone from Sutton's 1110 phone. The last of these calls occurred at 8:31 p.m., and Sutton's and Cavaness's cell phones both pinged a cell tower near Cavaness's residence in Toledo. Then, between 9:13 p.m. and 11:19 p.m., Cavaness's and Sutton's cell phones pinged various cell towers located between Toledo and Fostoria and in Fostoria itself. Eventually, Cavaness's cell phone pinged a cell tower near Badillo's residence in Fostoria a total of 10 times. As for Sutton's 1110 phone, it pinged a cell tower near Badillo's residence in Fostoria a total of 7 times. These included the call to Badillo's cell phone, which occurred at approximately 9:36 p.m. and lasted 41 seconds.

{¶18} Beginning at roughly 11:50 p.m., after the second suspect had fled Badillo's residence, pings from Sutton's 1110 phone were registered just north of Badillo's residence and then later in the Toledo area in the proximity of Sutton's residence. Interestingly, while Cavaness had been killed at approximately 11:30 p.m. on October 19, 2019, his cell phone pinged three different cell towers north of Fostoria after his death. Curious is the fact Cavaness's cell phone twice pinged a cell tower very near Sutton's residence in Toledo.[2] Cavaness's cell phone was never recovered. (June 8, 2021 Tr. at 236).

---

[2] State's Exhibit 9B is an enlarged map depicting only these calls and the location of the pinged cell tower in relation to Sutton's residence.

{¶19} Sergeant Gazarek testified that she also analyzed Sutton's 1109 phone, which Detective Bell had given to her after taking it from Sutton on October 25, 2019. (June 7, 2021 Tr. at 97, 119-120); (State's Ex. 7). Sergeant Gazarek stated that she reviewed the data contained in the cell phone and found that there had been multiple searches on the website of a local newspaper, the *Tiffin Advertiser-Tribune*, for information relating to the investigation of the incident at Badillo's residence, though she did not describe the search terms that had been used. (June 7, 2021 Tr. at 119-120). Sergeant Gazarek did not find any searches of the *Tiffin Advertiser-Tribune's* website prior to October 22, 2019. (June 7, 2021 at 119).

{¶20} Additional evidence collected by Detective Bell and other investigators was submitted for forensic analysis. Evidence gathered from Badillo's residence included two handguns used by the intruders as well as a palm print lifted from the interior side of Badillo's backdoor. (State's Exs. 3, 4); (Defendant's Exs. C, C2). These three items of evidence were submitted to the Ohio Bureau of Criminal Investigation ("BCI") for analysis. BCI analysis determined that there was insufficient DNA on one of the handguns to make any comparisons. (June 8, 2021 Tr. at 232-233). Sufficient DNA was found on the other handgun, but only Badillo's and Cavaness's DNA were found on the weapon. (June 8, 2021 Tr. at 234). Furthermore, although the palm print was not compared to exemplars from

Cavaness, Badillo, or McCarthy, Sutton was excluded as the source of the palm print. (June 8, 2021 Tr. at 139, 141); (Defendant's Exs. C, C2).

{¶21} BCI also analyzed a shoeprint lifted from Badillo's residence. This shoeprint was collected from the exterior side of Badillo's backdoor—the door that had been forcibly breached when Cavaness and the second intruder entered Badillo's residence. BCI analyst Vicki Bartholomew testified that she compared the shoeprint to a test impression created using the size 12 Jordan basketball shoes taken from Sutton on the day of his interview with Detective Bell. (June 8, 2021 Tr. at 131-132); (State's Exs. 10, 11). Bartholomew stated she compared the shoeprint to the test impression by doing "visual overlays with the shoes with a transparency overlay and with the question impression from [the] scene." (June 8, 2021 Tr. at 129-133). Observing sufficient similarities between the shoeprint and the test impression, Bartholomew found support for a conclusion that the shoeprint found on Badillo's backdoor and the test impression were made by the same source, i.e., Sutton's size 12 Jordan basketball shoes. (June 8, 2021 Tr. at 132-133); (State's Ex. 12).

{¶22} However, Bartholomew could not exclude other shoes as being the source of the shoeprint found on Badillo's backdoor. Bartholomew's report included a statement that "other manufactured items with the same characteristics may exist." (State's Ex. 12). She testified that shoes like Sutton's are "mass

manufactured" and that the tread design appearing on Sutton's shoes "can be used on * * * different models of the same shoe." (June 8, 2021 Tr. at 135). Bartholomew further stated that manufacturers "can actually use the same out sole size for multiple sized shoes" and that "the same tread pattern and size can actually be used for multiple shoe sizes themselves." (June 8, 2021 Tr. at 136). Thus, according to Bartholomew, the shoeprint found on Badillo's backdoor could have been made by a shoe similar to Sutton's but different in size. (June 8, 2021 Tr. at 135-137). Bartholomew agreed that there are "a lot" of shoes like Sutton's in production. (June 8, 2021 Tr. at 136). Finally, Bartholomew testified that she did not analyze Sutton's shoes for the presence of dirt, blood, hair, fibers, or mud because such analyses are outside her field of expertise. (June 8, 2021 Tr. at 135, 143).

{¶23} After hearing the foregoing evidence, on June 11, 2021, the trial court found Sutton guilty of all of the counts and specifications contained in the indictment. The trial court deferred sentencing pending the preparation of a presentence investigation report. On June 30, 2021, the trial court sentenced Sutton as follows: 10-15 years in prison on Count One; 3 years in prison for the firearm specification associated with Count One; 10-15 years in prison on Count Two; 3 years in prison for the firearm specification associated with Count Two; 15 years to life in prison on Count Three; 3 years in prison for the firearm specification associated with Count Three; 36 months in prison on Count Four; 10-15 years in

prison on Count Five; and 3 years in prison for the firearm specification associated with Count Five. The trial court ordered the prison sentences for two of the firearm specifications, Count One, and Count Three to be served consecutively to one another. The trial court further ordered that the prison sentences for Counts Two, Four, and Five be served concurrently with Sutton's sentence for Count Three. As a result, the trial court sentenced Sutton to an aggregate term of 31 years to life in prison. The trial court filed its judgment entry of sentence on June 30, 2021.

## II. Assignments of Error

{¶24} On September 27, 2021, Sutton filed a notice of appeal. He raises the following nine assignments of error for our review:

> **1. Appellant was denied his right to counsel when the trial court deprived him the right of the counsel of his choosing prior to trial in violation of his rights guaranteed under the Sixth Amendment to the United States Constitution and corresponding provisions of the Constitution of the State of Ohio.**
>
> **2. Appellant was denied the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution when trial counsel failed to engage in plea negotiations, and further failed to provide appellant Sutton with professional advice on the crucial decision of whether to take a plea.**
>
> **3. Appellant's constitutional right to a jury trial was violated when his waiver was not knowingly and intelligently made.**
>
> **4. The individual and cumulative effect of defense counsel's performance was so deficient that appellant Jeron Sutton was denied the effective assistance of counsel in violation of his rights guaranteed under the Sixth Amendment to the United States**

**Constitution and corresponding provisions of the Constitution of the State of Ohio.**

**5.    The admission of witnesses as to the content of unauthenticated records, constitutes plain error in violation of appellant Jeron Sutton's due process and confrontation rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Constitution of the State of Ohio.**

**6.    The admission of expert testimony by witnesses which the State did not sufficiently qualify as experts is plain error in violation of Evidence Rule 702 and the appellant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Constitution of the State of Ohio.**

**7.    The convictions are against the manifest weight of the evidence.**

**8.    The State failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.**

**9.    The cumulative effect of multiple errors deprived appellant of his constitutionally guaranteed right to a fair trial under the Federal and State Constitution.**

### III. Discussion

**A.  First Assignment of Error:  Did the trial court violate Sutton's right to counsel by not continuing the trial?**

{¶25} In his first assignment of error, Sutton argues that the trial court violated his constitutional right to counsel.  Sutton maintains that the trial court deprived him of his right to counsel when it "forced [him] to choose between being represented at trial by attorneys he felt were not zealously defending him or

represent[ing] himself." Although he does not say so explicitly, implicit in Sutton's argument is a claim that the trial court could have protected Sutton's right to counsel by once again continuing the trial to allow him to retain substitute counsel.

**{¶26}** In deciding whether to continue a proceeding, a trial court should generally consider "the length of the delay requested; the inconvenience to the litigants, witnesses, opposing counsel, and the court; and whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived." *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). The decision whether to grant a continuance is "entrusted to the broad, sound discretion of the trial judge" and "[a]n appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *Id.*, quoting *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

**{¶27}** At the beginning of Sutton's trial, the following exchange was had between Sutton and the trial court:

| [Sutton]: | I was offered a deal Friday as you know. |
|---|---|
| [Trial Court]: | I did not know that. |
| [Sutton]: | Oh, well. I was offered a deal Friday. It was – it was, the way it was explained to me I didn't understand it. The way it was explained I didn't understand it. There's a lot of stuff going on |

right now and that, but really don't agree with, don't understand and I'd like the – they offered me, what, it was a ten-year deal offered but it was a weapons under disability, and I'm not at liberty to do that. So they offered me a deal and I – I felt like I had no time to consider the deal. I wanted some specialists on this case. I have no specialists. I ask that you – I would just put on the record that there's just a lot of stuff that I wanted that I don't have. I mean, it was not like – excuse me.

[Trial Court]:        That's all right. It's your case.

[Sutton]:        I mean, like I said, I wanted specialists. I wanted specialists. I wanted to have a cell phone specialist. I don't have any. I don't have any. I can't tell you why I don't have any.

[Trial Court]:        Well these are lawyers you hired, sir.

[Sutton]:        I was just told two weeks ago that they didn't know anyone. Then I was told today they didn't need it. They felt they didn't need it. I don't even know the game plan going in here.

[Trial Court]:        Well this is an old case.

[Sutton]:        I understand.

[Trial Court]:        And they're – they're the second lawyers that you've hired.

[Sutton]:        I understand. They told me what was going on. Like I said, I just wanted to put it on the record.

-18-

Case No. 13-21-11

(June 7, 2021 Tr. at 8-9). The State then read its plea offer into the record, after which further discussion was had between Sutton, his trial attorneys, and the trial court:

[Sutton]: Yeah, he, he explained it to me. I was under – well, when he told me –

[Trial Court]: [The prosecutor] knows that I have, and I suspect you know as well, that if there is a joint recommendation, I will follow it. If it says that they're going to run together, I'll order them to run together.

[Sutton]: That's – that's what I was told by [Trial Counsel 1], but when I looked it up myself it was saying that I could do three years and then the ten years but –

[Trial Court]: Well, I'm just telling you what's on the table today.

[Sutton]: Yeah, I understand.

[Trial Court]: Since you hired them, you can fire them, but you need to know, sir, that this case has been around a long time. We're going to go to trial today.

[Sutton]: I understand. Understandable, understandable.

* * *

[Trial Court]: Okay. What do you want to do? Do you want to talk to your lawyers a little bit?

[Sutton]: Honestly, like I told him, I never even had a chance to consider it so I will be forced to go to trial.

-19-

| | |
|---|---|
| [Trial Court]: | All right. We're going to trial then. Well, hang on. Do you want to have them as your attorneys? |
| [Sutton]: | I can't represent myself. |
| [Trial Court]: | Well you can, sir. |
| [Sutton]: | I mean, like I said, from the beginning I don't even have the right – the tools that I want. They don't even have the tools that I want them to have to represent me. |
| [Trial Court]: | Well, they both indicated they're ready to go to trial. Is that correct, counselor? |
| [Trial Counsel 1]: | Your Honor, if it may please the court, we are beyond ready to go to trial. Strategically we have put in place everything that we need to. The reasons we don't have any, the experts that he speaks of are strategic, and we are ready and we do not – we did not feel the need. So we are ready to go to trial. |

(June 7, 2021 Tr. at 12-13).

**{¶28}** After reviewing these exchanges, we conclude that the trial court did not abuse its discretion by not continuing Sutton's trial. Importantly, Sutton did not expressly request a continuance from the trial court. While Sutton's remarks suggest that he desired more time to prepare his case or that he might have wanted time to retain substitute counsel, Sutton did not advise the trial court how much additional time he needed or what, if anything, he could reasonably be expected to achieve with more time. Consequently, the trial court could not assess whether a continuance was justified, whatever its length. Moreover, Sutton's trial had been

-20-

continued four times during the pendency of the case. In fact, the last time the trial court continued Sutton's trial, the trial court advised Sutton that no further continuances would be granted. (Doc. No. 65). Finally, Sutton's concerns about his attorneys and their preparedness for trial were not expressed until the morning of trial. By the time of trial, Sutton had been represented by these attorneys apparently without incident for nearly nine months, the entirety of which he was released on bond and available to assist them in crafting his defense. There is no indication in the record that Sutton could not have brought his concerns to the trial court's attention at an earlier date. Thus, the trial court did not abuse its discretion by proceeding to trial on June 7, 2021.

{¶29} Nor did the trial court's decision to proceed to trial deprive Sutton of his right to counsel. We note that Sutton, similar to his request for a continuance, did not clearly request that he be allowed the opportunity to retain substitute counsel. However, he expressed dissatisfaction with his attorneys, and these comments support that he may have had a desire to secure the services of alternative counsel.

{¶30} Although "'the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate * * * rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.'" *Jones*,

91 Ohio St.3d at 342, quoting *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692 (1988). "[C]ourts should 'balanc[e] * * * the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.'" *Id.* at 342-343, quoting *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996). "Decisions relating to the substitution of counsel are within the sound discretion of the trial court." *Id.* at 343.

**{¶31}** To the extent Sutton in fact wanted to retain substitute counsel, the trial court's decision to not grant another continuance denied him the ability to do so. We note, however, that Sutton had been released on bond and could have sought other counsel of his choosing at any time prior to the commencement of his trial. He was only denied the ability to do so because of his untimely request.

**{¶32}** Here, the case had been pending for nearly a year and a half when Sutton complained about his attorneys. Sutton's two trial attorneys had represented him for nearly nine months of that time, but Sutton waited until the morning of trial to bring his concerns to the trial court's attention. Once Sutton advised the trial court about his issues regarding his attorneys' preparation, the trial court queried Sutton's attorneys concerning their readiness for trial and received assurances that they were willing and able to proceed. They further indicated that there were strategic reasons for the decisions Sutton found objectionable. After that, Sutton did not press the matter further. Under these circumstances, the trial court did not

err by proceeding to trial without allowing Sutton the chance to retain yet further substitute counsel.

**{¶33}** Sutton's first assignment of error is overruled.

**B. Third Assignment of Error: Did Sutton knowingly and intelligently waive his right to a jury trial?**

**{¶34}** In his third assignment of error, Sutton argues that he did not knowingly and intelligently waive his right to a jury trial. Sutton maintains that the trial court failed to conduct a sufficient colloquy on the record before accepting the jury waiver. He also claims his waiver was invalid because he had only minutes to decide whether to waive his right to a jury trial and because he was not able to effectively consult with counsel given that he had "just requested to fire [his] attorneys prior to [the] waiver."

**{¶35}** "The Sixth Amendment to the United States Constitution and Article I, Section Ten of the Ohio Constitution guarantee a criminal defendant the right to a jury trial." *State v. Tosco*, 3d Dist. Marion No. 9-08-21, 2009-Ohio-408, ¶ 14. "Pursuant to Crim.R. 23(A), a criminal defendant may knowingly, voluntarily, and intelligently waive this constitutional right to a jury trial." *Id.* R.C. 2945.05, which governs the manner in which a defendant may waive his right to a jury trial, provides:

> In all criminal cases pending in courts of record in this state, the
> defendant may waive a trial by jury and be tried by the court without
> a jury. Such waiver by a defendant, shall be in writing, signed by the

defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I _____, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

**{¶36}** "The Supreme Court of Ohio has construed R.C. 2945.05 to require five conditions to be met in order for a waiver to be validly imposed." *State v. Ames*, 3d Dist. Allen No. 1-19-02, 2019-Ohio-2632, ¶ 8. "The waiver must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *Id.*, citing *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, ¶ 9. Furthermore, "'[a] jury waiver must be voluntary, knowing, and intelligent.'" *Id.* at ¶ 9, quoting *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 45. "'[I]f the record shows a jury waiver, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made.'" *Id.*, quoting *Osie* at ¶ 45. "'[A] written waiver is presumptively voluntary, knowing, and intelligent.'" *Id.*, quoting *Osie* at ¶ 45.

**{¶37}** Just before his trial was set to begin, Sutton elected to waive his right to a jury trial:

[Trial Court]:          The trial starts in seven minutes. Thank you.

-24-

[Trial Counsel 2]: Do you want a jury or do you want to waive jury?

[Sutton]: I don't know.

(Recess taken.)

[Trial Court]: We're back on the record in this case. The court has been advised that Mr. Sutton is prepared to waive his right to jury trial and proceed with a court trial. Is that correct, sir?

[Sutton]: Yes, sir.

* * *

[Trial Court]: What you have in front of you, sir, is a waiver of jury trial. It says, "I, Jeron D. Sutton, defendant in the above cause hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a judge of the court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury." Is that your desire to waive your right to jury trial, sir?

[Sutton]: Yes, sir.

[Trial Court]: And you've had an opportunity to discuss that with your attorneys?

[Sutton]: Yes, sir.

[Trial Court]: Very well then. You may execute the waiver if you so desire. The court accepts the waiver, orders it to be journalized. * * *

[Trial Counsel 2]: Thank you, Your Honor.

(June 7, 2021 Tr. at 14-15). Sutton's signed jury waiver form, which conformed exactly to the model language contained in R.C. 2945.05, was then filed and made part of the record. (Doc. No. 76).

{¶38} Contrary to Sutton's assertion, the trial court's brief dialogue was sufficient to ensure a valid waiver of his right to a jury trial. "[A] defendant need not have a complete or technical understanding of the jury trial right in order to knowingly and intelligently waive it." *State v. Bays*, 87 Ohio St.3d 15, 20 (1999). While it "may be better practice for the trial judge to enumerate all the possible implications of a waiver of a jury," the trial court is not required to "interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells*, 53 Ohio St.3d 22, 25-26 (1990). Indeed, "a trial court does not need to engage in an extended colloquy with the defendant in order to comply with the statutory requirement that a jury waiver be made in open court." *Lomax* at ¶ 42. Although there must be "some evidence in the record of the proceedings that the defendant acknowledged the waiver to the trial court while in the presence of counsel, if any," the trial court need not recite any "magic words." *Id.* at ¶ 42, 48. Here, by reading the jury waiver form aloud to Sutton, the trial court adequately apprised Sutton of his constitutional right to a trial by jury. The trial court then asked whether Sutton wanted to waive his right to a jury trial and whether he had been counseled in making his decision. Sutton answered both questions in the

affirmative and then executed the waiver form in the courtroom with counsel present. Thus, the record demonstrates the trial court's compliance with R.C. 2945.05 and supports that Sutton's waiver was knowing, intelligent, and voluntary. *See Bays* at 18-20; *Jells* at 25-26; *State v. Webb*, 10th Dist. Franklin No. 10AP-289, 2010-Ohio-6122, ¶ 31-35.

{¶39} Furthermore, we are not persuaded by Sutton's claims that his waiver was invalid because he was rushed into waiving his right to a jury trial or because he was not properly counseled regarding his decision. First, although the record indicates that Sutton waived his right to a jury trial just minutes before his trial was to start, the record does not speak to how long Sutton might have been considering waiving a jury trial. While it is certainly possible that the option of waiving his right to a jury trial was not previously brought to Sutton's attention, it is equally possible that Sutton had discussed the matter with counsel well in advance of trial. Regardless, we decline to recognize any bright-line rule limiting a defendant's ability to waive his right to a jury trial under time constraints like those present in this case. In addition, as discussed under Sutton's first assignment of error, Sutton voiced dissatisfaction with his trial attorneys, but after his attorneys indicated that they were prepared to go to trial, Sutton lodged no further objections to being represented by them. These attorneys then proceeded to advise Sutton concerning his decision whether to waive his right to a jury trial. From our review of the record,

we find no reason to conclude that his waiver was anything but knowing, intelligent, and voluntary.

**{¶40}** Sutton's third assignment of error is overruled.

## C. Fifth Assignment of Error: Did the trial court commit plain error by admitting unauthenticated cell-phone records in violation of Sutton's rights under the Confrontation Clause?

**{¶41}** In his fifth assignment of error, Sutton argues that the trial court committed plain error by admitting evidence that was derived from unauthenticated cell-phone records. Sutton focuses on two types of evidence that were based on the call records and cell tower data obtained from Sutton's and Cavaness's cellular service providers: (1) State's Exhibits 9A-9G, the maps Sergeant Gazarek created using the CASTViz program, and (2) Sergeant Gazarek's testimony explaining and interpreting these maps. Sutton claims that the cell-phone records underlying this evidence were not authenticated as business records and that, as a result, it cannot be determined whether the records are testimonial hearsay implicating his rights under the Confrontation Clause.

### i. The Confrontation Clause & Cell-Phone Records

**{¶42}** "The Confrontation Clause to the Sixth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that '"[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."'" *State v. Thomas*, 3d Dist.

Marion No. 9-19-73, 2020-Ohio-5379, ¶ 17, quoting *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354 (2004), quoting the Confrontation Clause. The similar provisions of Section 10, Article I of the Ohio Constitution "provide[] no greater right of confrontation than the Sixth Amendment * * *." *State v. Self*, 56 Ohio St.3d 73, 79 (1990).

{¶43} "Only testimonial hearsay implicates the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 185. "'[T]estimonial statements are those made for "a primary purpose of creating an out-of-court substitute for trial testimony."'" *Id.*, quoting *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 40, quoting *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143 (2011). Statements qualify as testimonial if they have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266 (2006). The Confrontation Clause prohibits admission of testimonial hearsay statements made by a witness who does not appear at trial "unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness." *Maxwell* at ¶ 34, citing *Crawford* at 53-54.

{¶44} Business records are typically considered to be nontestimonial because "'they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.'" *State v. Craig*, 110 Ohio

St.3d 306, 2006-Ohio-4571, ¶ 82, quoting *People v. Durio*, 7 Misc.3d 729, 734, 794 N.Y.S.2d 863 (2005). Business records are "generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S.Ct. 2527 (2009). Cell-phone records usually qualify as business records because "[e]ven when cell-phone companies, in response to a subpoena, prepare types of records that are not normally prepared for their customers, those records still contain information that cell-phone companies keep in the ordinary course of their business." *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, ¶ 36. Accordingly, the Confrontation Clause does not normally affect the admissibility of cell-phone records. *Id.* at ¶ 39.

{¶45} Nevertheless, unless it is established that a cell-phone record is in fact a business record, the Confrontation Clause can operate to bar admission of the record. Evid.R. 803(6) governs the admissibility of business records.

> "To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'"

*State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 171, quoting Weissenberger, Ohio Evidence Treatise 600, Section 803.73 (2007). Evid.R. 803(6)'s foundational requirement is especially critical in this context. Without a certification or affidavit authenticating cell-phone records as business records or testimony from a "custodian or other qualified witness" identifying the cell-phone records as authentic business records, it cannot be determined whether the cell-phone records are nontestimonial. *Hood* at ¶ 41-42. Under such circumstances, admission of the cell-phone record is constitutional error. *Id.* at ¶ 42.

**ii. The State failed to authenticate the cell-phone records as business records pursuant to Evid.R. 803(6).**

{¶46} In this case, the cell-phone records obtained for Sutton's and Cavaness's cell phones were not themselves admitted as evidence at Sutton's trial. Instead, the information contained in these records was introduced at Sutton's trial via Sergeant Gazarek's testimony and State's Exhibits 9A-9G. However, regardless of the format the State used to present the contents of the cell-phone records, it was incumbent on the State to authenticate them as business records under Evid.R. 803(6). But the State failed to do so. Although Detective Bell testified he obtained the cell-phone records for Sutton's and Cavaness's cell phones using search warrants submitted to their cellular service providers and Sergeant Gazarek stated she received the cell-phone records directly from Detective Bell, neither Detective Bell nor Sergeant Gazarek were a custodian of the cell-phone records or an "other

qualified witness" as that term is used in Evid.R. 803(6). *See Hood* at ¶ 40. Furthermore, the record contains no certification or affidavit authenticating the cell-phone records as business records, and no representatives from Sutton's or Cavaness's cellular service providers were subpoenaed to testify at trial. *See id.* at ¶ 41. Thus, the State failed to authenticate the cell-phone records as business records, making it impossible to determine whether the records are nontestimonial, and because it is not possible to determine whether the cell-phone records are nontestimonial, the trial court erred by admitting the evidence derived from those records.

**iii. Although the cell-phone records were not authenticated as business records pursuant to Evid.R. 803(6), the trial court did not commit plain error by admitting the evidence derived from those records.**

{¶47} Sutton did not object to Sergeant Gazarek's testimony or to the admission of State's Exhibits 9A-9G for lack of proper authentication. As a result, our review is limited to whether the trial court committed plain error by admitting State's Exhibits 9A-9G and by allowing Sergeant Gazarek's testimony concerning these exhibits.[3] *See Thomas*, 2020-Ohio-5379, at ¶ 16. For plain error to apply, the trial court must have deviated from a legal rule (the "error prong"), the error must have been plain, i.e., an obvious defect in the proceeding (the "plainness prong"), and the error must have affected the defendant's "substantial rights" (the

---

[3] Throughout the remainder of our analysis of this assignment of error, "Sergeant Gazarek's testimony and State's Exhibits 9A-9G" and the "cell-phone records" are used interchangeably.

"substantial-rights prong"). *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The trial court's admission of Sergeant Gazarek's testimony and State's Exhibits 9A-9G clearly satisfies the first two prongs of the plain-error test—the trial court committed constitutional error by admitting the unauthenticated cell-phone records and the error is "obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection." *State v. Gullick*, 10th Dist. Franklin No. 13AP-26, 2013-Ohio-3342, ¶ 3.

{¶48} The relevant question thus becomes whether the trial court's error affected Sutton's substantial rights. The Supreme Court of Ohio has interpreted the substantial-rights prong of the plain-error test "to mean that the trial court's error must have affected the outcome of the trial." *Barnes* at 27. For decades, the court consistently described this standard in terms of outcome determination—i.e., that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus; *see State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16; *State v. Hill*, 92 Ohio St.3d 191, 203 (2001); *State v. Moreland*, 50 Ohio St.3d 58, 62 (1990). But in 2015, in *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, the court appeared to embrace a more relaxed standard. In *Rogers*, the court explained that in order to show that the trial court's error affected the outcome of the trial, the accused is "required to demonstrate a reasonable *probability* that the error resulted in

prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* at ¶ 22. Two years after *Rogers*, in *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, a plurality of the court indicated that *Rogers* had "clarified" the substantial-rights prong of the plain-error test. *Id.* at ¶ 33.

{¶49} Recently, in *State v. West*, ___ Ohio St.3d ___, 2022-Ohio-1556, a three-Justice plurality of the court held to the position that *Rogers* "'rejected the notion that there is any category of forfeited error that is not subject to the plain error rule's requirement of prejudicial effect on the outcome.'" *Id.* at ¶ 2, quoting *Rogers* at ¶ 24. In doing so, the plurality used both outcome-determinative and reasonable-probability standards in describing the substantial-rights prong, at times using language related to both standards in the same sentence. *Id.* at ¶ 22, 29, 35-36. For instance, the three-Justice plurality noted that the defendant bore "the burden to establish a reasonable probability that but for the judge's actions, he would not have been found guilty of the charged offenses," and it held that the defendant "failed to establish the prejudice prong of the plain-error rule" because he was "unable to show any reasonable probability that the outcome of his trial would have been otherwise." *Id.* at ¶ 35-36. This articulation of the standard, i.e., that the defendant must show a reasonable probability that the error was outcome determinative, mirrors the one the court applies when reviewing assertions of

prejudice in ineffective-assistance-of-counsel claims. *E.g.*, *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138 ("To establish ineffective assistance of counsel, an appellant must show * * * prejudice, i.e., a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different."). And although this expression of the standard did not garner a majority in *West*, it was essentially approved by a unanimous court the very next day in *State v. McAlpin*, ___ Ohio St.3d ___, 2022-Ohio-1567. *Id.* at ¶ 90 ("McAlpin could not establish plain error, because he cannot show a reasonable probability that but for standby counsel's actions, the jury would have acquitted him.").

{¶50} Thus, when assessing the substantial-rights prong of the plain-error test, courts ought to apply the standard endorsed by the Supreme Court of Ohio in *Rogers*, as implemented by the three-Justice plurality in *West* and the unanimous court in *McAlpin*. That is, to demonstrate that the trial court's error affected a substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise. This in turn requires the defendant to show "'that the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.'" *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 130, quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333 (2004), quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052 (1984).

{¶51} In applying this standard to the facts of this case, we observe that the State's case was significantly enhanced due to Sergeant Gazarek's testimony and State's Exhibits 9A-9G. Neither Badillo nor McCarthy were able to identify the second intruder. Badillo could only describe the second intruder in general terms, i.e., a tallish, average-sized black male. In addition, the State presented no DNA, blood, fiber, hair, or fingerprint evidence connecting Sutton to Badillo's residence, and Sutton was excluded as the source of the palm print on Badillo's backdoor.

{¶52} Furthermore, without Sergeant Gazarek's testimony and State's Exhibits 9A-9G, there is no evidence rebutting Sutton's claims about his activities and whereabouts on October 19-20, 2019. The cell-phone records were essential in this respect—they demonstrated that Sutton had likely lied to Detective Bell and to Murdock. During the October 25, 2019 interview, Sutton denied that he was ever in Fostoria on October 19, 2019, and insisted that he was in possession of both of his cell phones for the entirety of October 19-20, 2019. Given that each of Sutton's cell phones pinged cell towers in and around Fostoria on the afternoon of October 19, 2019, it is highly improbable that both these claims are true. Sutton also told Detective Bell that he had picked Cavaness up at around 8:30 p.m. and that he had dropped him off in Toledo a minimum of 45 minutes to an hour later. Sutton similarly told Murdock that he had dropped Cavaness off at a gas station in Toledo at approximately 10:30 p.m. Yet, shortly after 9:00 p.m., Sutton's 1109 phone was

already pinging cell towers far south of Toledo, and not long thereafter, Cavaness's cell phone and Sutton's 1110 phone began pinging cell towers in and around Fostoria. Thus, the cell-phone records suggested that neither Sutton nor Cavaness were in Toledo at the time Sutton claimed to have dropped Cavaness off. Instead, the cell-phone records placed both men in the general vicinity of Badillo's residence near the time of the incident.

{¶53} Additionally, Sergeant Gazarek's testimony and State's Exhibits 9A-9G showed that, after Cavaness was killed at Badillo's house in Fostoria, Cavaness's cell phone pinged a cell tower far north of Fostoria in Toledo. This tower was in close proximity to Sutton's residence. Thus, the cell-phone records supported an inference that Sutton had possession of Cavaness's cell phone shortly after the incident took place.

{¶54} Nevertheless, even with Sergeant Gazarek's testimony and State's Exhibits 9A-9G removed from the equation, there is still persuasive evidence that, in its totality, identifies Sutton as being the second intruder. Sutton and Cavaness were long-time friends, perhaps since their high school days. It is undisputed that Sutton picked Cavaness up at approximately 8:30 p.m. on October 19, 2019. There was no testimony or other evidence placing Cavaness with any other person after that time. It was Sutton's cell phone, not Cavaness's, that was used to call Badillo, and Sutton claimed to have been in possession of that cell phone throughout October

19-20, 2019. Furthermore, given that, per Sutton's statements, Sutton and Cavaness were together around the time Badillo received the phone call from Sutton's phone, it is reasonable to infer that Cavaness was aware of that phone call.

{¶55} In addition, it was determined that Sutton's shoes could have made the shoeprint found on Badillo's backdoor. Sutton also gave arguably inconsistent statements about dropping off Cavaness. He told Detective Bell that he had picked Cavaness up at around 8:30 p.m. and dropped him off in Toledo a minimum of 45 minutes to an hour later. Sutton told Murdock that he had dropped Cavaness off at a gas station in Toledo at approximately 10:30 p.m. We also note that Sutton became agitated when Detective Bell interviewed him and asked about being in Fostoria on the night of the incident. From his demeanor in responding to this line of questioning, one could infer he may have been less than truthful with his answer. Finally, on October 22, 2019—the day before Detective Bell notified Murdock that Cavaness had been killed and possibly before Cavaness had even been identified— Sutton's cell phone was used to search the *Tiffin Advertiser-Tribune's* website for information regarding the investigation of the incident at Badillo's residence. There was no indication that the cell phone had been used to perform searches of the *Tiffin Advertiser-Tribune's* website prior to that day.

{¶56} While the State's case against Sutton is certainly stronger with the cell-phone records than it is without them, the probability that a trial untainted by the

trial court's error would have turned out differently is not so great as to undermine our confidence in the outcome of Sutton's trial. In our view, a trier of fact—aware that Sutton had picked up Cavaness mere hours before the incident, and that Badillo had received a call from Sutton's cell phone shortly before the break-in, and that Sutton's shoes matched those used to kick in Badillo's backdoor, and that Sutton's cell phone had been used to search for information about the incident likely before Cavaness was publicly identified as the deceased intruder—would not be likely to find that the State failed to prove Sutton's identity as the second intruder. Therefore, Sutton failed to demonstrate that there is a reasonable probability that, but for the trial court's erroneous admission of the cell-phone records, the outcome of his trial would have been different. Consequently, Sutton failed to establish the substantial-rights prong of the plain-error test, and we conclude that the trial court did not commit plain error by allowing Sergeant Gazarek's testimony or admitting State's Exhibits 9A-9G.

{¶57} Sutton's fifth assignment of error is overruled.

## D. Sixth Assignment of Error: Did the trial court err by admitting testimony from persons not properly qualified as experts under Evid.R. 702?

{¶58} In his sixth assignment of error, Sutton argues that the trial court erred by allowing the State to elicit testimony from Sergeant Gazarek concerning the cell-phone records and from Bartholomew concerning the identification of the shoeprint found on Badillo's backdoor. He claims the record does not contain evidence

demonstrating that Sergeant Gazarek or Bartholomew were "qualified to render a scientific opinion on cellular transmission location data [or] forensic shoeprint comparison, respectively." Sutton maintains that it is "error to permit expert testimony from a witness who is not qualified by the court and further fails to demonstrate that they have the requisite qualifications to be qualified by the court."

{¶59} Under Evid.R. 702, a witness may be permitted to testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Ordinarily, "any decision concerning the admission or exclusion of expert testimony will not be disturbed absent an abuse of discretion." *State v. Burks*, 3d Dist. Shelby

-40-

No. 17-10-27, 2011-Ohio-3529, ¶ 22.  However, because Sutton failed at trial to challenge Sergeant Gazarek's or Bartholomew's qualifications to testify as expert witnesses, Sutton has forfeited all but plain error.  *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 115.

**{¶60}** We begin with Sutton's argument as it relates to Sergeant Gazarek's testimony.  For purposes of Sutton's argument, we assume without deciding that only experts may offer testimony like that given by Sergeant Gazarek, though substantial authority in Ohio supports that this may not in fact be the case.  *See State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 37-40 (noting that Ohio appellate courts "have allowed non-experts to testify about a cell phone's utilization of a tower to ascertain where a phone was located at a specific time" and citing cases).  Furthermore, we assume, again without deciding, that Sergeant Gazarek does not possess the expert qualifications necessary to testify as she did in this case.  However, notwithstanding these assumptions, we have already held under Sutton's fifth assignment of error that despite the trial court's error in allowing Sergeant Gazarek's testimony, it did not commit plain error.  That conclusion is controlling here.

**{¶61}** Shifting to Sutton's arguments about Bartholomew's testimony, we note that courts are generally lenient in allowing opinion testimony relating to

shoeprint comparison and identification. As the Supreme Court of Ohio has explained,

> a lay witness may be permitted to express his or her opinion as to the similarity of footprints if it can be shown that his or her conclusions are based on measurements or peculiarities in the prints that are readily recognizable and within the capabilities of a lay witness to observe. This means that the print pattern is sufficiently large and distinct so that no detailed measurements, subtle analysis or scientific determination is needed. In such a situation, the pattern is simply identified as being similar to that customarily made by shoes. In essence, the testimony is "more in the nature of description by example than the expression of a conclusion."

*Jells*, 53 Ohio St.3d at 29, quoting *State v. Hairston*, 60 Ohio App.2d 220, 223 (3d Dist.1977). Here, Bartholomew stated that she used a visual overlay technique to compare a tape lift of the shoeprint found on Badillo's backdoor to the test impression created from Sutton's shoe. Although Bartholomew did create an enhanced image of the tape-lifted shoeprint to aid in her analysis, she testified that she "relied primarily on the tape lift of the shoe impression for the comparison itself." (June 8, 2021 Tr. at 130). From our review, the tread patterns on the tape-lifted shoeprint and on the test impression are both sufficiently large and distinct that no detailed measurement, subtle analysis, or scientific determination would be required. Bartholomew simply compared the two tread patterns and rationally determined, based on her own personal observations and perceptions of the evident similarities between the two patterns, that the same shoe might have created both impressions. It would have been permissible for a lay witness to express the opinion

rendered by Bartholomew in this case. Thus, regardless of whether Bartholomew possesses the qualifications necessary to testify as an expert in shoeprint comparison, the trial court did not commit any error, let alone plain error, by allowing Bartholomew's testimony.

**{¶62}** Sutton's sixth assignment of error is overruled.

**E. Second & Fourth Assignments of Error: Did Sutton receive ineffective assistance of counsel?**

**{¶63}** In his second and fourth assignments of error, Sutton argues that he received ineffective assistance of counsel. Sutton alleges that his trial attorneys were deficient in four different respects: (1) his trial attorneys failed to engage in plea negotiations; (2) his trial attorneys failed to provide him with professionally competent advice regarding his decision whether to enter a plea; (3) his trial attorneys failed to challenge the State's cell phone and shoeprint evidence under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993); and (4) his trial attorneys failed to object to the admission of the unauthenticated cell-phone records.

**i. Ineffective-Assistance-of-Counsel Standard**

**{¶64}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1)

counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland*, 466 U.S. at 687. In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

**{¶65}** Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

**ii. Sutton failed to establish that he received ineffective assistance of counsel.**

{¶66} In his second and fourth assignments of error, Sutton identifies four ways in which his trial attorneys were supposedly ineffective. We address each of these alleged deficiencies separately.

**a. Failure to Engage in Plea Negotiations**

{¶67} Sutton first asserts that his trial attorneys were ineffective because they failed to engage in plea negotiations. However, the record completely belies Sutton's claim. On June 3, 2021, four days before Sutton's trial, the Seneca County Prosecuting Attorney sent the following email to Sutton's trial attorneys:

> To confirm our recent phone call, I can live with your client pleading guilty to Count Two Aggravated Robbery without the gun specification (F1) with an agreed recommendation of an indefinite sentence of 10-15 years and a guilty plea to Count Four Weapons Under Disability with an agreed recommendation of 36 months concurrent. We would have sentencing directly after the plea. The State would dismiss the remaining counts with prejudice at the time of sentencing.

(Doc. No. 94, Response to Sutton's Motion for New Trial). At 2:00 p.m. the following day, June 4, 2021, one of Sutton's trial attorneys replied, "Our client has asked us to counter with a plea to the same charges and an agreed upon sentence of 5 years. Can this be done?" (Doc. No. 94). Six minutes later, the Prosecuting Attorney responded, "No way. [Sutton's other trial attorney] asked for 'my best offer.' I've made it. I'd rather lose at trial than give him 1 minute less than 10-15." (Doc. No. 94). Seventeen minutes later, Sutton texted one of his trial attorneys, "8?" (Doc. No. 93, Sutton's Brief in Support of Motion for New Trial, Ex. A).

Sutton's attorney immediately replied, "Nope, won't come off it," "10-15," and "You would do 10." (Doc. No. 93, Ex. A).

{¶68} The record thus reflects that Sutton's trial attorneys negotiated with the Seneca County Prosecuting Attorney and achieved a very favorable result for Sutton. In exchange for guilty pleas to one first-degree felony and one third-degree felony, the State would have dismissed the pending murder charge—the most serious charge pending against Sutton—as well as two additional first-degree felony charges and all of the firearm specifications. Furthermore, the State would have recommended that Sutton serve his sentences concurrently, resulting in a sentence significantly shorter than the sentence of 31 years to life in prison Sutton ultimately received. Clearly, the Prosecuting Attorney's offer was conveyed to Sutton, who requested that his trial attorneys counter with an offer that would cap his prison sentence at 5 years. The Prosecuting Attorney flatly rejected Sutton's counteroffer and made it known that he had made his best offer. Although Sutton seems to have suggested that his trial attorneys make a further counteroffer, Sutton was advised that there was no better deal to be had. Based on the Prosecuting Attorney's email, Sutton was accurately informed of plea negotiations. Having reviewed the record, it is clear that Sutton's trial attorneys performed competently in negotiating a plea deal for Sutton and that they fulfilled their essential duties to Sutton by submitting the Prosecuting Attorney's best offer to Sutton for his consideration.

### b. Failure to Properly Advise Regarding Plea Decision

{¶69} Sutton also argues that his trial attorneys were ineffective because they failed to properly explain the particulars of the Prosecuting Attorney's plea offer or counsel him regarding the benefits and drawbacks of accepting the offer. He points to comments in the trial transcript allegedly demonstrating that he was confused about the terms of the plea deal, and he maintains that "[t]he record is absent any indication that [he] was afforded the benefit of counsel in weighing [the] crucial decision" whether to accept the plea offer. However, to the extent that Sutton might have been confused about the details of the plea offer, there is nothing in the record to suggest that Sutton's trial attorneys were responsible for his confusion. As is apparent from our discussion of the plea negotiations in this case, Sutton's trial attorneys related the Prosecuting Attorney's plea offer to Sutton with sufficient clarity that Sutton was able to devise a counteroffer. Sutton's trial counsel then informed Sutton that there was no room for further negotiation, after which Sutton had the remainder of June 4-6, 2021, to consider whether to accept the offer. On the day of his trial, Sutton was again notified of the terms of the plea offer when the Prosecuting Attorney read the terms of the offer into the record. (June 7, 2021 Tr. at 10-12). Afterward, Sutton acknowledged that the plea offer had previously been

explained to him and that he understood what was "on the table." (June 7, 2021 Tr. at 12). On this record, we fail to see what more Sutton's trial attorneys could have done to ensure that Sutton understood the terms of the plea offer.

{¶70} Moreover, as Sutton recognizes, the record is silent as to the advice he received from his trial attorneys concerning his decision whether to accept the plea deal. Whatever discussions were had between Sutton and his trial attorneys about his decision, such discussions took place off the record. Because we are unable to review the advice Sutton's trial attorneys gave him concerning his decision whether to accept the plea offer, or even ascertain whether any advice was given on the matter, we cannot determine whether Sutton's trial attorneys' performance was deficient in this respect. *See State v. Thompson*, 3d Dist. Marion No. 9-20-35, 2021-Ohio-2979, ¶ 34; *State v. Jacobson*, 4th Dist. Adams No. 01CA730, 2003-Ohio-1201, ¶ 15 ("Obviously, without knowing what advice trial counsel gave, we cannot determine whether that advice was deficient or prejudicial.").

### c. Failure to Raise *Daubert* Challenges

{¶71} Sutton further contends that his trial attorneys were ineffective for failing to raise *Daubert* challenges to Sergeant Gazarek's testimony, State's Exhibits 9A-9G, and Bartholomew's shoeprint-comparison testimony. Sutton argues that through the admission of Sergeant Gazarek's testimony and State's Exhibits 9A-9G, the State was able to present expert scientific evidence that failed

to satisfy the threshold reliability requirement of Evid.R. 702(C). Sutton claims that Bartholomew's shoeprint-comparison testimony was likewise scientifically unreliable. Sutton maintains that a *Daubert* hearing would have revealed Sergeant Gazarek's testimony, State's Exhibits 9A-9G, and Bartholomew's testimony to be scientifically invalid.

**{¶72}** "In determining whether the opinion of an expert is reliable under Evid.R. 702(C), a trial court, acting as a gatekeeper, examines whether the expert's conclusion is based on scientifically valid principles and methods." *State v. Wangler*, 3d Dist. Allen No. 1-11-18, 2012-Ohio-4878, ¶ 59. To aid trial courts in assessing scientific reliability, the Supreme Court of Ohio has adopted the following nonexclusive list of factors from the United States Supreme Court's decision in *Daubert*: (1) whether the theory or technique has been tested; (2) whether it has been subjected to peer review; (3) whether there is a known or potential rate of error; and (4) whether the methodology has gained general acceptance. *State v. Nemeth*, 82 Ohio St.3d 202, 211 (1998), citing *Daubert*, 509 U.S. at 593-594. "A *Daubert* hearing is a prospective examination of the admissibility of expert opinion to determine whether the basis for the testimony is scientifically valid and reliable." *State v. Heisey*, 2d Dist. Miami No. 2014-CA-34, 2015-Ohio-4610, ¶ 39.

**{¶73}** We have already concluded under Sutton's fifth assignment of error that the trial court did not commit plain error by admitting Sergeant Gazarek's

testimony or State's Exhibits 9A-9G.  Specifically, we concluded that Sutton failed to establish that he was prejudiced by the trial court's admission of this evidence. "[T]he prejudice standards for plain-error and ineffective-assistance-of-counsel claims are the same * * *."  *State v. Nurein*, 3d Dist. Union No. 14-21-18, 2022-Ohio-1711, ¶ 60; *see Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, at ¶ 22. Therefore, in light of our earlier holding, we conclude that even if Sutton's trial attorneys unjustifiably failed to request a *Daubert* hearing and if a *Daubert* hearing would have shown Sergeant Gazarek's testimony and State's Exhibits 9A-9G to be scientifically unreliable, Sutton has failed to demonstrate that he was prejudiced.

{¶74} As for Bartholomew's shoeprint-comparison testimony, we observed under Sutton's sixth assignment of error that Bartholomew's comparison did not involve "detailed measurement, subtle analysis, or scientific determination." Indeed, in a prior case involving testimony similar to Bartholomew's, the Supreme Court of Ohio observed that the witness "was not testifying as to the results of a scientific test" and that "therefore, the standard of a reasonable scientific certainty was not applicable."  *Jells*, 53 Ohio St.3d at 29.  Stated simply, Bartholomew's testimony was not required to satisfy the scientific reliability requirements of Evid.R. 702(C) because Bartholomew did not offer expert scientific testimony. Because the scientific reliability of Bartholomew's testimony was immaterial, Sutton's trial attorneys did not perform unreasonably or deficiently by failing to

-50-

request a *Daubert* hearing to scrutinize Bartholomew's testimony. *State v. Martin*, 9th Dist. Lorain No. 15CA010888, 2017-Ohio-2794, ¶ 13 (concluding that because detective's testimony was not expert testimony under Evid.R. 702 and *Daubert*, trial counsel was not ineffective for failing to request a *Daubert* hearing).

**d. Failure to Challenge Unauthenticated Cell-Phone Records**

**{¶75}** Finally, Sutton argues that his trial attorneys were ineffective for failing to object to the admission of the unauthenticated cell-phone records. Sutton takes issue once more with Sergeant Gazarek's testimony and with State's Exhibits 9A-9G. Again, we refer to our conclusion under Sutton's fifth assignment of error that Sutton failed to demonstrate that he was prejudiced by the admission of Sergeant Gazarek's testimony and State's Exhibits 9A-9G. We also reiterate that the prejudice standards for plain-error and ineffective-assistance-of-counsel claims are the same. *Nurein* at ¶ 60. Therefore, consistent with our earlier holding, we conclude that regardless of the caliber of Sutton's trial attorneys' performance as it relates to the unauthenticated cell-phone records, Sutton has failed to demonstrate that he was prejudiced.

**{¶76}** Sutton's second and fourth assignments of error are overruled.

**F. Seventh & Eighth Assignments of Error: Are Sutton's convictions supported by sufficient evidence and, if so, are his convictions against the manifest weight of the evidence?**

{¶77} In his seventh and eighth assignments of error, Sutton challenges the evidentiary basis for his convictions. In his seventh assignment of error, Sutton argues that his convictions are against the manifest weight of the evidence. In his eighth assignment of error, Sutton contends that the State presented insufficient evidence to support his convictions. However, in these assignments of error, Sutton fails to properly challenge the sufficiency or weight of the evidence supporting his convictions. In his seventh assignment of error, Sutton quotes cases setting forth the legal standards for manifest-weight-of-the-evidence challenges but says nothing more. Sutton's eighth assignment of error is similar. There, he quotes cases setting forth the standards for sufficiency-of-the-evidence review, adding only that the "State failed to meet its burden of production at trial" and that "viewing this evidence in a light favorable to the State, it is factually and legally insufficient to sustain a conviction."

{¶78} Sutton's seventh and eighth assignments of error are fatally defective. Among other deficiencies, Sutton's seventh and eighth assignments of error do not contain citations to the parts of the record on which he relies to support his arguments. *See* App.R. 16(A)(7). Sutton does not identify which elements of which offenses lack evidentiary support or what evidence the trial court supposedly misweighed in finding him guilty of the offenses and specifications charged in the indictment. As Sutton has failed to specifically identify for review the alleged

deficiencies on which his seventh and eighth assignments of error are based, or the location of these errors in the record, we need not consider these assignments of error further. App.R. 12(A)(2); *see State v. Glenn*, 3d Dist. Marion No. 9-19-64, 2021-Ohio-264, ¶ 29-30; *State v. Puryear*, 9th Dist. Summit No. 29155, 2019-Ohio-3979, ¶ 6.

{¶79} Sutton's seventh and eighth assignments of error are overruled.

**G. Ninth Assignment of Error: Did multiple trial court errors cumulatively deprive Sutton of his right to a fair trial?**

{¶80} In his ninth assignment of error, Sutton argues that "[e]ven if the individual errors [he alleged] constitute harmless error, the cumulative effect of those errors is anything but harmless." Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the *numerous instances* of trial court error does not individually constitute cause for reversal." (Emphasis added.) *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83. "To find cumulative error, a court must first find *multiple* errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." (Emphasis added.) *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36. Here, we have found that the trial court committed only one nonprejudicial error: the admission of the unauthenticated cell-phone records through Sergeant Gazarek's testimony and

State's Exhibits 9A-9G.  Because the trial court committed only one error in this case, the cumulative-error doctrine does not apply.  *See State v. Jamison*, 9th Dist. Summit No. 27664, 2016-Ohio-5122, ¶ 40 ("If there [are] not multiple errors, * * * the cumulative error doctrine does not apply.").

**{¶81}** Sutton's ninth assignment of error is overruled.

### IV. Conclusion

**{¶82}** For the foregoing reasons, Sutton's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Seneca County Court of Common Pleas.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur**

**/jlr**