[Cite as *State v. Lucas*, 2022-Ohio-3278.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  1-21-53

      v.

DEJUAN J. LUCAS, SR.,                O P I N I O N

      DEFENDANT-APPELLANT.

---

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  1-21-54

      v.

DEJUAN J. LUCAS, SR.,                O P I N I O N

      DEFENDANT-APPELLANT.

---

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  1-21-55

      v.

DEJUAN J. LUCAS, SR.,                O P I N I O N

      DEFENDANT-APPELLANT.

Case No. 1-21-53, 1-21-54 and 1-21-55

**Appeals from Allen County Common Pleas Court**
**Trial Court Nos. CR2020 0413, CR2020 0179 and CR2020 0375**

**Judgments Affirmed**

**Date of Decision: September 19, 2022**

APPEARANCES:

*Chima R. Ekeh* for Appellant

*Jana E. Emerick* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Dejuan J. Lucas, Sr., appeals the October 12, 2021 judgments of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

### I. Facts & Procedural History

{¶2} These cases concern allegations of Lucas's involvement in drug trafficking and drug possession, and the fatal consequences of his involvement, during the period of March 2019 through September 2020.

**A. Controlled Drug Buys & the Search of 609 East Elm St. – Case No. CR2020 0179**

{¶3} In March 2019, investigators from the West Central Ohio Crime Task Force began working with confidential informants to conduct controlled drug purchases from Lucas. On March 19, 2019, a confidential informant met Lucas at 331 West Grand Avenue in Lima, where Lucas sold the informant a mixture of heroin and fentanyl. On August 13, 2019, a different confidential informant, Robert Bryant, purchased fentanyl from Lucas. This purchase took place at a house located at 609 East Elm Street in Lima. On August 19, 2019, Bryant went back to 609 East Elm Street, where Lucas sold him a mixture of cocaine, heroin, and fentanyl. Based on these purchases, investigators secured a warrant to search 609 East Elm Street. The investigators executed the search warrant on August 30, 2019, and during the search, investigators located quantities of heroin, fentanyl, and cocaine as well as three firearms.

{¶4} On July 16, 2020, the Allen County Grand Jury indicted Lucas on the following counts in case number CR2020 0179 ("Indictment #1"): Counts One and Five of trafficking in heroin in violation of R.C. 2925.03(A)(1), fourth-degree felonies; Counts Two, Three, and Six of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1), fourth-degree felonies; Count Four of trafficking in cocaine in violation of R.C. 2925.03(A)(1), a fourth-degree felony; Count Seven of possession of heroin in violation of R.C. 2925.11(A), a first-degree felony; and

Count Eight of possession of a fentanyl-related compound in violation of R.C. 2925.11(A), a second-degree felony. Counts One through Six each alleged the offense was committed in the vicinity of a school. Furthermore, Counts Seven and Eight each contained three different firearm forfeiture specifications pursuant to R.C. 2941.1417(A). On September 16, 2020, Lucas pleaded not guilty to the counts and specifications contained in Indictment #1.

**B. The Death of Dino Gerdeman – Case No. CR2020 0375**

{¶5} In the early-morning hours of May 27, 2020, officers from the Lima Police Department responded to a complaint about unruly occupants in Room 252 at the Travelodge Motel in Lima. Inside of Room 252, officers found three women— Kea'Londa Peoples-Fuqua, Destiny Knuckles, and Keousha Florence— as well as the unresponsive body of Dino Gerdeman. Efforts to revive Gerdeman were unsuccessful. The coroner determined the cause of Gerdeman's death was combined drug toxicity, with fentanyl being the principal contributor. The investigation revealed that Gerdeman had consumed the drugs that caused his death while celebrating his birthday with Peoples-Fuqua, Knuckles, and Florence in Room 252. Gerdeman had requested and received the drugs from Peoples-Fuqua, who had in turn obtained the drugs from Lucas.

{¶6} On October 15, 2020, the Allen County Grand Jury indicted Lucas on the following counts in case number CR2020 0375: Count One of corrupting

-4-

another with drugs in violation of R.C. 2925.02(A)(2), a second-degree felony, and Count Two of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony. Corrupting another with drugs was alleged as the predicate felony offense for Count Two. On November 12, 2020, the Allen County Grand Jury returned a superseding indictment charging Lucas as follows in case number CR2020 0375 ("Indictment #2"): Count One of involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony, and Count Two of corrupting another with drugs in violation of R.C. 2925.02(A)(3), a second-degree felony. No particular felony was alleged as the predicate felony offense for Count One of Indictment #2. On November 23, 2020, Lucas appeared for arraignment and pleaded not guilty to the counts contained in Indictment #2.

## C. Drug Possession at Time of Arrest – Case No. CR2020 0413

{¶7} On September 14, 2020, Lucas was arrested on an outstanding warrant issued in conjunction with Indictment #1. A search of Lucas's person incident to his arrest revealed that he was in possession of a mixture of heroin and fentanyl. Lucas was also carrying $715.

{¶8} On November 12, 2020, the Allen County Grand Jury indicted Lucas on the following counts in case number CR2020 0413 ("Indictment #3"): Count One of possession of heroin in violation of R.C. 2925.11(A), a third-degree felony, and Count Two of possession of a fentanyl-related compound in violation of R.C.

2925.11(A), a third-degree felony.  Both counts contained a specification pursuant to R.C. 2941.1417(A) seeking forfeiture of the $715 found on Lucas's person.  On November 23, 2020, Lucas appeared for arraignment and pleaded not guilty to the counts and specifications contained in Indictment #3.

## D.  Motion for Joinder

{¶9} On February 9, 2021, the State filed a motion to join Indictment #1, Indictment #2, and Indictment #3 for purposes of trial.  The State argued that joinder was appropriate because "[a]ll of the cases relating to [Lucas] have to do with [his] drug trafficking, possession, and the resulting death of another due to [his] trafficking in drugs."  Lucas and the State each filed memoranda in support of their respective positions on the issue of joinder.

{¶10} A hearing on the State's motion for joinder was held on May 17, 2021. On June 7, 2021, the trial court granted the State's motion.

## E.  Trial & Sentencing

{¶11} A jury trial was held on August 30-September 2, 2021.  On September 2, 2021, the jury found Lucas guilty of all the counts and specifications charged in each of the indictments.  The trial court accepted the jury's verdicts and continued the matter for sentencing at a later date.

{¶12} Lucas's sentencing hearing was held on October 7, 2021. At the sentencing hearing, the trial court determined that various offenses merged. Thereafter, the trial court sentenced Lucas as follows:

- 12 months in prison on Count Two of Indictment #1, trafficking in a fentanyl-related compound;

- 12 months in prison on Count Three of Indictment #1, trafficking in a fentanyl-related compound;

- 12 months in prison on Count Six of Indictment #1, trafficking in a fentanyl-related compound;

- 8-12 years in prison on Count Seven of Indictment #1, possession of heroin;

- 6 years in prison on Count One of Indictment #2, involuntary manslaughter; and

- 18 months in prison on Count Two of Indictment #3, possession of a fentanyl-related compound.

The trial court ordered that all of these sentences be served consecutively for an aggregate term of 18.5 to 22.5 years in prison. Finally, the trial court ordered the forfeiture of the three firearms located during the search of 609 East Elm Street and the $715. The trial court filed its judgment entries of sentence on October 12, 2021.

## II. Assignments of Error

{¶13} On November 9, 2021, Lucas timely filed notices of appeal. Lucas's appeals were subsequently consolidated for briefing and argument. He raises the following three assignments of error for our review:

**1. Appellant's conviction for involuntary manslaughter predicated on corrupting another with drugs was not supported by legally sufficient evidence and was otherwise against the manifest weight of the evidence.**

**2. Appellant's conviction for possession of heroin and fentanyl-related compound, Count Seven and Eight, in case number CR 2020 [0179][1] were not supported by sufficient evidence and were otherwise against the manifest weight of the evidence.**

**3. The trial court erred in granting the State's motion for consolidation of the three separate cases for purposes of trial.**

### III. Discussion

**A. First & Second Assignments of Error: Does sufficient evidence support Lucas's involuntary-manslaughter and possession convictions? If so, are they nonetheless against the manifest weight of the evidence?**

{¶14} In his first and second assignments of error, Lucas challenges the evidentiary basis for several of his convictions. In his first assignment of error, Lucas challenges his involuntary-manslaughter conviction. Lucas does not dispute that he provided drugs to Peoples-Fuqua, that Peoples-Fuqua in turn provided those drugs to Gerdeman, and that Gerdeman died as a proximate result of accessing and using those drugs. Instead, Lucas maintains that the evidence does not support his involuntary-manslaughter conviction because there is no evidence that he knowingly furnished Gerdeman with the drugs that killed him. In his second

---

[1] In setting forth his second assignment of error, Lucas referred to Counts Seven and Eight of case number CR2020 0413. However, only two counts were filed in case number CR2020 0413. Indictment #1, which was filed in case number CR2020 0179, was the only indictment containing counts designated as Counts Seven and Eight. Additionally, these two counts merged and Lucas was only sentenced on Count Seven.

assignment of error, Lucas challenges his convictions for possession of heroin and possession of a fentanyl-related compound as charged in Counts Seven and Eight of Indictment #1. Lucas notes that he was not present at 609 East Elm Street during the execution of the search warrant on August 30, 2019, and he maintains that he was therefore not in immediate physical possession of the heroin and fentanyl found during the search. Lucas contends that, due to his absence from 609 East Elm Street, he could only be convicted under a theory of constructive possession, and he claims that the evidence does not support that he constructively possessed the drugs.

**i. Standards for Sufficiency-of-the-Evidence & Manifest-Weight Review**

{¶15} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶16} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found

the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶17} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### ii. Involuntary Manslaughter

{¶18} Lucas was found guilty of involuntary manslaughter and corrupting another with drugs. The offense of involuntary manslaughter is codified at R.C. 2903.04, which provides in pertinent part that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). "The culpable mental state of involuntary manslaughter is supplied by the underlying offense." *State v. Johnson*, 8th Dist. Cuyahoga No. 94813, 2011-Ohio-1919, ¶ 54.

{¶19} A predicate felony for Lucas's involuntary-manslaughter charge was corrupting another with drugs.[2] The offense of corrupting another with drugs is codified at R.C. 2925.02, which provides in relevant part that "[n]o person shall knowingly * * * [b]y any means, * * * furnish to another * * * a controlled substance, and thereby cause serious physical harm to the other person * * *." R.C. 2925.02(A)(3). The culpable mental state for corrupting another with drugs, and thus for involuntary manslaughter in this case, is "knowingly." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such

---

[2] Although the corrupting-another-with-drugs offense charged in Indictment #2 merged with the involuntary-manslaughter offense at sentencing, in determining whether Lucas's involuntary-manslaughter conviction is supported by the evidence, we must also consider whether the evidence supports the jury's finding that Lucas committed the offense of corrupting another with drugs.

circumstances probably exist." R.C. 2901.22(B). "In determining whether the defendant acted knowingly * * *, the jury may infer the defendant's state of mind from the surrounding circumstances." *State v. Shaw*, 8th Dist. Cuyahoga No. 105111, 2018-Ohio-403, ¶ 17.

{¶20} The term "furnish" is not defined in the Revised Code. *State v. Richard*, 3d Dist. Marion No. 9-20-36, 2021-Ohio-2980, ¶ 64. However, we have defined "furnish" as meaning """"to supply, provide, or equip, for accomplishment of a particular purpose."""" *State v. Thompson*, 3d Dist. Marion No. 9-20-35, 2021-Ohio-2979, ¶ 47, quoting *State v. Price*, 8th Dist. Cuyahoga No. 107096, 2019-Ohio-1642, ¶ 49, quoting *Black's Law Dictionary* 466 (6th Ed.1991). In addition, the Ohio Jury Instructions for the offense of corrupting another with drugs defines "furnished" to mean "provided, supplied, or gave access to," which was the definition given to the jury in this case. *Ohio Jury Instructions*, CR Section 525.02 (Rev. Jan. 5, 2013). Thus, under these expansive definitions, "to be guilty of corrupting another with drugs (by *furnishing* a controlled substance), it is of no consequence whether the controlled substance is sold or delivered directly to a victim, provided that the sale gave the victim *access* to the controlled substance." (Emphasis sic.) *Richard* at ¶ 64, citing *Price* at ¶ 51 and *State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, ¶ 86. Nevertheless, a furnisher of drugs cannot be found guilty of corrupting another with drugs under R.C.

2925.02(A)(3) merely because "the ultimate user suffer[ed] serious physical harm."

*State v. Ridley*, 6th Dist. Lucas No. L-18-1184, 2020-Ohio-402, ¶ 33. As the Sixth

District explained:

> Such a broad application impermissibly rewrites the language of the statute. R.C. 2925.02(A)(3) defines the crime as knowingly furnishing drugs to another, where "the other person" suffers serious physical harm. The statute does not state "any other person," but rather explicitly limits it to the person to whom the drugs were furnished. Thus, appellant must knowingly provide the drugs to the person who ultimately suffered the serious physical harm.

*Id.*

{¶21} Accordingly, the relevant question is whether the evidence supports

that Lucas knowingly, albeit through a third person, furnished drugs to another who

consequently suffered serious physical harm. Formulated more precisely, the

question is whether Lucas was aware that, by providing the drugs to Peoples-Fuqua,

he was probably giving Gerdeman access to those drugs. After reviewing the

record, we conclude that the evidence does support such a conclusion.

{¶22} Peoples-Fuqua, who had also been criminally charged in relation to

Gerdeman's death, testified at Lucas's trial as part of a plea agreement to resolve

those charges. Peoples-Fuqua testified that she worked for Gerdeman and that she

knew Gerdeman to use drugs. (Aug. 30-Sept. 2, 2021 Tr. at 842, 844). However,

she stated that she does not use drugs and that she never used drugs with Gerdeman.

(Aug. 30-Sept. 2, 2021 Tr. at 844-845, 890). Peoples-Fuqua testified that on May

26, 2020, Gerdeman asked her to obtain heroin for his birthday party. (Aug. 30-Sept. 2, 2021 Tr. at 851). According to Peoples-Fuqua, she then contacted Lucas, with whom she had had a previous sexual relationship, and asked him whether he had any heroin. (Aug. 30-Sept. 2, 2021 Tr. at 851). Lucas indicated that he did have heroin. Peoples-Fuqua testified that she then went to Lucas's residence, where Lucas gave her a paper bindle containing purported heroin in exchange for money. (Aug. 30-Sept. 2, 2021 Tr. at 851, 853). Peoples-Fuqua stated that she took the bindle, which was later found to contain fentanyl, to Room 252, put the bindle on a table or dresser, and told Gerdeman that the drugs were in the room. (Aug. 30-Sept. 2, 2021 Tr. at 858, 870-872). Peoples-Fuqua testified that she had never before purchased drugs from Lucas or for Gerdeman. (Aug. 30-Sept. 2, 2021 Tr. at 853).

{¶23} Lucas did not testify at his trial. However, the State presented a video recording of a September 24, 2020 interview between Lucas and Detective Bryan Snyder of the Lima Police Department. In the recording, Lucas confirms his prior sexual relationship with Peoples-Fuqua. (State's Ex. 103). He acknowledges that Peoples-Fuqua does not know much about the "drug game" and that Peoples-Fuqua had never obtained drugs from him before. (State's Ex. 103). However, he eventually admits that he gave Peoples-Fuqua drugs on May 26, 2020. (*See* State's Ex. 103). In the recording, Lucas indicates that he was aware that Peoples-Fuqua was going to a party later that evening and that "she got a little play." (State's Ex.

103). Lucas states that he asked Peoples-Fuqua where she was "hustling" and that she told him that she was going to "trick with the dude" for his birthday. (State's Ex. 103).

{¶24} Based on the foregoing evidence, a reasonable finder of fact could readily conclude that Lucas was aware that he was giving "the dude," i.e., Gerdeman, access to drugs through Peoples-Fuqua. As evidenced by their prior sexual relationship, Lucas and Peoples-Fuqua were clearly familiar with one another. Given this familiarity, a finder of fact could infer that Lucas was aware that Peoples-Fuqua was not a drug user. Moreover, Lucas and Peoples-Fuqua both acknowledged that Peoples-Fuqua had never obtained drugs from Lucas prior to May 26, 2020. These facts and inferences, in conjunction with Lucas's understanding that Peoples-Fuqua was "hustling" and his knowledge that Peoples-Fuqua would leave their rendezvous to "trick with the dude" for his birthday, support a further inference that Lucas was aware that Peoples-Fuqua was probably obtaining the drugs so that the "dude" (Gerdeman) could use them at his birthday party. Therefore, the State presented sufficient evidence to support a conclusion that, by giving drugs to Peoples-Fuqua under circumstances where it was evident that a defined third party would likely be given access to those drugs, Lucas knowingly furnished drugs to Gerdeman. Furthermore, in light of the undisputed, credible, and compelling evidence upon which it is based, this conclusion is not

against the weight of the evidence. Therefore, we conclude that Lucas's involuntary-manslaughter conviction is supported by legally sufficient evidence and that it is not against the manifest weight of the evidence.

### iii. Possession of Drugs

{¶25} The offense of possession of drugs is codified at R.C. 2925.11, which provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "The issue of whether a person charged with drug possession knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.'" *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235, ¶ 45, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

{¶26} "Possession of drugs can be either actual or constructive." *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 25. "A person has 'actual possession' of an item if the item is within his immediate physical possession." *State v. Williams*, 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶ 23. "A person has 'constructive possession' if he is able to exercise domination and control over an item, even if the individual does not have immediate

physical possession of it." *Bustamante* at ¶ 25.  "For constructive possession to exist, '[i]t must also be shown that the person was conscious of the presence of the object.'" *Id.*, quoting *State v. Hankerson*, 70 Ohio St.2d 87, 91 (1982).  "[T]he State may prove the existence of the various elements of constructive possession of contraband by circumstantial evidence alone." *Id.*  "Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession." *State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, ¶ 19.

{¶27} It is undisputed that Lucas did not have actual possession of the drugs found inside of 609 East Elm Street.  Consequently, the dispositive issue is whether, despite his absence from 609 East Elm Street during the execution of the search warrant, Lucas was nevertheless capable of exercising domination and control over the heroin and fentanyl found in the residence and aware that the drugs were there. Having reviewed the record, we find that the State presented overwhelming evidence to prove both of these elements of constructive possession.

{¶28} At Lucas's trial, various witnesses, including law enforcement officers and a confidential informant, testified concerning three controlled drug purchase operations that took place in August 2019.  Lucas was the target of each operation and each purchase (or attempted purchase) took place at 609 East Elm Street.  On

August 13, 2019, a team of law enforcement officers, including Investigator Aaron Montgomery, watched as confidential informant Robert Bryant went to the back door of 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 350-351). Bryant was allowed into the residence and reemerged only seconds later. (Aug. 30-Sept. 2, 2021 Tr. at 350-351). Bryant then rendezvoused with the officers and surrendered a packet containing a substance that was later identified as fentanyl. (Aug. 30-Sept. 2, 2021 Tr. at 354-355). Bryant testified that Lucas was the person who let him into 609 East Elm Street on August 13, 2019, and that Lucas was the person who sold him the drugs. (Aug. 30-Sept. 2, 2021 Tr. at 396-398).

{¶29} The second operation took place on August 19, 2019, with Bryant again acting as a confidential informant. To arrange the controlled purchase, Bryant placed a phone call to a telephone number ending in 4040. (Aug. 30-Sept. 2, 2021 Tr. at 359-360). Investigator Montgomery testified that Bryant contacted the 4040 number to arrange both the August 13 and August 19, 2019 controlled purchases. (Aug. 30-Sept. 2, 2021 Tr. at 359-360). During the phone call on August 19, 2019, the person Bryant was talking to told him, "Come to my house in twenty." (Aug. 30-Sept. 2, 2021 Tr. at 363, 403); (State's Ex. 15). Bryant identified Lucas as the person he was talking to during the phone call, and he testified that he understood Lucas to be referring to 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 403).

{¶30} The August 19, 2019 controlled purchase went much the same as the first controlled purchase. Investigators watched as Bryant went to the back of 609 East Elm Street, where he was allowed to enter. (Aug. 30-Sept. 2, 2021 Tr. at 363). Seconds later, Bryant reemerged, and shortly thereafter, he handed over a packet containing a substance later identified as a mixture of cocaine, heroin, and fentanyl. (Aug. 30-Sept. 2, 2021 Tr. at 363, 365-366, 382-383). According to Bryant, it was once again Lucas who let him into 609 East Elm Street and sold him the drugs. (Aug. 30-Sept. 2, 2021 Tr. at 404).

{¶31} After the August 19, 2019 operation, investigators surveilled 609 East Elm Street. Investigator Montgomery testified that he saw Lucas walking from the rear of 609 East Elm Street on August 27, 2019. (Aug. 30-Sept. 2, 2021 Tr. at 374, 441). A third controlled purchase was attempted the following day, August 28, 2019. During the August 28, 2019 operation, Lucas was observed sitting on the front porch with a person who investigators identified as Martin Bledsoe. (Aug. 30-Sept. 2, 2021 Tr. at 374-375, 443). Investigator Montgomery testified that a confidential informant, who was unidentified at trial, approached Lucas but that the purchase was unsuccessful because Lucas accused the informant of working with police. (Aug. 30-Sept. 2, 2021 Tr. at 443).

{¶32} On August 29, 2019, investigators obtained a warrant to search 609 East Elm Street. The warrant was executed during the early-morning hours of

August 30, 2019. (Aug. 30-Sept. 2, 2021 Tr. at 450). During their sweep of the house, officers located Bledsoe in an upstairs room. (Aug. 30-Sept. 2, 2021 Tr. at 450-451). No other person was located inside of 609 East Elm Street.

{¶33} The search of 609 East Elm Street uncovered a number of items of interest. Suspected drugs were found in the kitchen cabinets, in a box of Captain Crunch cereal located on top of the kitchen refrigerator, and on the living room floor. (Aug. 30-Sept. 2, 2021 Tr. at 471-478); (State's Exs. 56-57, 68-78, 80-83). These substances were later found to contain varying quantities of heroin, cocaine, and fentanyl. (State's Ex. 112). Furthermore, several scales were located throughout the lower level of the house, including on the kitchen counter and on the dining room table. (State's Exs. 46, 48, 49, 58, 59, 79, 89).

{¶34} In addition, cell phones were found in various locations inside of 609 East Elm Street. A white-silver iPhone and a Verizon ZTE flip phone were discovered around the couch in the living room. (Aug. 30-Sept. 2, 2021 Tr. at 466); (State's Exs. 60, 61). No data were extracted from these phones, and ownership of these phones was never established. (Aug. 30-Sept. 2, 2021 Tr. at 499-500, 554). However, investigators were able to access the contents of a third cell phone discovered in an upstairs bedroom. This cell phone was associated with a phone number ending in 4040—the same number Bryant contacted to arrange the August 13 and August 19, 2019 controlled drug purchases. (Aug. 30-Sept. 2, 2021 Tr. at

494-495). When investigators examined the cell phone, they found a series of text messages between Lucas and the mother of his children. (Aug. 30-Sept. 2, 2021 Tr. at 520). Investigator Montgomery opined that these text messages demonstrated that the phone was solely Lucas's phone rather than a "dope phone" shared between multiple drug dealers. (Aug. 30-Sept. 2, 2021 Tr. at 520-521). Although Investigator Montgomery could not rule out the possibility that a "dope phone" could contain a drug dealer's intimate personal information, he stated that the presence of Lucas's sensitive personal information suggested that the phone was controlled exclusively by Lucas. (Aug. 30-Sept. 2, 2021 Tr. at 520-521, 551-552).

{¶35} Other personal effects were discovered alongside the cell phone in the upstairs bedroom. The closet was filled with men's clothing, hats, shoes, and liquor. (Aug. 30-Sept. 2, 2021 Tr. at 489); (State's Ex. 54). A picture of Lucas and his children was discovered tucked inside of a bible found in a dresser. (Aug. 30-Sept. 2, 2021 Tr. at 490); (State's Exs. 66-67). A certificate acknowledging Lucas's completion of an anger management course was found in a manila folder along with Lucas's birth certificate and Lucas's resume. (Aug. 30-Sept. 2, 2021 Tr. at 492); (State's Ex. 85). The contact phone number listed on Lucas's resume was the number ending in 4040. (Aug. 30-Sept. 2, 2021 Tr. at 495); (State's Ex. 85). Investigator Montgomery testified that the presence of these personal items indicated that Lucas was using 609 East Elm Street as his residence rather than as a

mere drug house. (Aug. 30-Sept. 2, 2021 Tr. at 496). He stated that "through the hundreds of investigations that [he has] been [a part of], if it's just a trap house or you're using it specifically only for drug sells, you are not going to leave any type or do your best to [not] leave any type of personal information." (Aug. 30-Sept. 2, 2021 Tr. at 496). Investigator Montgomery noted that other than some old pieces of mail belonging to prior residents of 609 East Elm Street who had since moved out, investigators did not find personal information relating to any person other than Lucas. (Aug. 30-Sept. 2, 2021 Tr. at 560).

{¶36} However, Investigator Montgomery acknowledged that Lucas was not the title owner of 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 369). Moreover, Investigator Montgomery testified that he did not think that Lucas had entered into a lease agreement for 609 East Elm Street or that the electric bill was in Lucas's name. (Aug. 30-Sept. 2, 2021 Tr. at 369-370). But Investigator Montgomery explained that, in his experience, "those that are using [a] specific residence to sell drugs are not going to get lease agreements or rentals in their name, especially electric bills and that. That's very common." (Aug. 30-Sept. 2, 2021 Tr. at 373). He said it was not unusual that Lucas did not own or formally lease 609 East Elm Street and that Lucas distancing his name from 609 East Elm Street is a common tactic to "avoid law enforcement detection." (Aug. 30-Sept. 2, 2021 Tr. at 373).

**{¶37}** In addition, Investigator Montgomery addressed Bledsoe's presence inside of 609 East Elm Street. He testified that Bledsoe had been ruled out of the investigation and that it was established that Bledsoe did not live at 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 558). Investigator Montgomery stated that it is not common for a drug dealer to leave a substantial quantity of drugs, as was found in this case, in a house utilized by multiple drug dealers. (Aug. 30-Sept. 2, 2021 Tr. at 529). He explained that dealers are "going to leave somebody there that they trust. It's a friend or somebody that they can let them know that there's drug sells coming. They're not just going to let anybody in there." (Aug. 30-Sept. 2, 2021 Tr. at 529).

**{¶38}** Bryant also offered testimony concerning Lucas's use and control of 609 East Elm Street and the extent to which others had access to the property. Bryant testified that he helped Lucas move into 609 East Elm Street by carrying in a "whole house" worth of items including furniture, bedding, clothes, shoes, televisions, and a dinette set. (Aug. 30-Sept. 2, 2021 Tr. at 390, 413-414). According to Bryant, everything he helped carry into 609 East Elm Street was Lucas's property. (Aug. 30-Sept. 2, 2021 Tr. at 413-414). In addition, Bryant stated that he installed a security camera system for Lucas at 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 390). He installed two cameras at the front door, one camera at the back door, one camera on the side of the house, and one camera in the kitchen.

(Aug. 30-Sept. 2, 2021 Tr. at 391). Bryant also worked on Lucas's truck, which investigators observed parked behind 609 East Elm Street. (Aug. 30-Sept. 2, 2021 Tr. at 390, 408-409); (State's Ex. 91).

{¶39} Bryant testified that although he did not know if anyone else was inside of 609 East Elm Street during the August 13 and August 19, 2019 controlled drug purchase operations, there was "usually always somebody there" besides Lucas. (Aug. 30-Sept. 2, 2021 Tr. at 404-405). Bryant stated that he "assume[d]" others sold drugs out of 609 East Elm Street because "it was a drug house," but he only remembered one previous occasion where he thought someone other than Lucas had sold drugs there. (Aug. 30-Sept. 2, 2021 Tr. at 410-413). However, Bryant testified that he only ever dealt with Lucas at 609 East Elm Street and that he only ever bought drugs from Lucas there. (Aug. 30-Sept. 2, 2021 Tr. at 412).

{¶40} The foregoing evidence convincingly demonstrates that Lucas had constructive possession of the heroin and fentanyl found inside of 609 East Elm Street on August 30, 2019. Overwhelming evidence establishes that Lucas was the primary, if not the sole, resident of 609 East Elm Street. Nevertheless, Lucas's possession of the heroin and fentanyl cannot be inferred solely from his access to the drugs through his occupation of 609 East Elm Street. *See* R.C. 2925.01(K). Here, however, there is additional evidence supporting that Lucas was able to exercise domination and control over the drugs. On two successive days shortly

-24-

before the August 30, 2019 search, Lucas was seen on the premises of 609 East Elm Street. Moreover, during the two controlled drug purchase operations that occurred within the same month as the August 30, 2019 search, Lucas sold Bryant substances containing cocaine, heroin, and fentanyl. These were the same substances found in various locations throughout the lower level of 609 East Elm Street on August 30, 2019. Thus, the evidence shows that, not long before the August 30, 2019 search, Lucas had access to and control of drugs inside of 609 East Elm Street sufficient to allow him to transact drug sales.

{¶41} Lucas argues that the evidence does not support that he constructively possessed the heroin and fentanyl because "the record indicates multiple people lived in, or had access to, 609 East Elm Street." Lucas points to Bryant's testimony that multiple people were always present with Lucas at 609 East Elm Street and that Bryant had seen another person sell drugs from the property. We note that, aside from Bledsoe, whose presence and significance we have already discussed, it does not appear that investigators saw anyone other than Lucas and the various confidential informants at 609 East Elm Street in August 2019. Regardless, even if many people had access to 609 East Elm Street and multiple people sold drugs from the property, this would not foreclose a finding that Lucas constructively possessed the heroin and fentanyl. "[E]xclusive access to the item need not be established in order to constructively possess contraband." *State v. Myles*, 3d Dist. Marion No. 9-

19-74, 2020-Ohio-3323, ¶ 27. "[T]he state need not establish ownership to prove constructive possession and two or more persons may have possession of an object together if they can control it, exclusive of others." *State v. Caudill*, 12th Dist. Madison No. CA2017-05-011, 2018-Ohio-550, ¶ 13. Here, even assuming multiple people had the ability to access and control the heroin and fentanyl found inside of 609 East Elm Street, the evidence supports that Lucas's domination and control over the drugs would be at least equal to that of any of these hypothetical persons.

{¶42} Finally, we must consider whether the evidence establishes that Lucas was conscious of the presence of the drugs inside of 609 East Elm Street. The evidence clearly supports that Lucas was aware that the drugs were there. In the weeks before the August 30, 2019 search, Lucas sold quantities of cocaine, heroin, and fentanyl to Bryant inside of 609 East Elm Street. On the day of the search, drugs were found out in the open on the living room floor and in highly visible locations within the kitchen cabinets. Having concluded that the evidence establishes that Lucas occupied 609 East Elm Street, it is more than reasonable to infer that Lucas was aware of the presence of these drugs so conspicuously situated in his residence.

{¶43} In sum, substantial credible evidence supports both that Lucas was able to exercise domination and control over the heroin and fentanyl found inside of 609 East Elm Street on August 30, 2019, and that Lucas was aware that the drugs

were inside of the residence on that date. Consequently, we conclude that Lucas's possession-of-heroin and possession-of-a-fentanyl-related-compound convictions are supported by sufficient evidence and that they are not against the manifest weight of the evidence.

{¶44} Lucas's first and second assignments of error are overruled.

**B. Third Assignment of Error: Did the trial court err by joining the three indictments for purposes of a single trial?**

{¶45} In his third assignment of error, Lucas argues that the trial court erred by joining Indictments #1, #2, and #3 for purposes of a single trial. Lucas does not take issue with the trial court's decision to join Indictments #1 and #3 for purposes of trial. Instead, Lucas argues that Indictment #2 should not have been joined with Indictments #1 and #3 because the involuntary-manslaughter and corrupting-another-with-drugs charges contained in Indictment #2 were dissimilar from the drug-trafficking and drug-possession charges contained in Indictments #1 and #3 and not based on the same transaction. Lucas further maintains that even if joinder was permissible, it was nonetheless prejudicial.

**i. Applicable Law & Standard of Review**

{¶46} "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). Under Crim.R. 13, "[t]he court may order two or more indictments or informations or both to be tried

together, if the offenses or the defendants could have been joined in a single indictment or information." Crim.R. 8(A) provides:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶47} However, even if joinder would be permissible under Crim.R. 13 and 8(A), a trial court should not order joinder where it appears that the defendant would be prejudiced thereby. *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 20. Crim.R. 14 states that "[i]f it appears that a defendant * * * is prejudiced by a joinder * * * for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." To obtain severance pursuant to Crim.R. 14, the *accused* bears "the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial[.]" *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus.

{¶48} Lucas initially made both Crim.R. 8(A) and Crim.R. 14 arguments to oppose the joinder of Indictment #2 with Indictments #1 and #3. "Ordinarily, appellate courts review a trial court's decision on joinder of offenses for trial under

an abuse-of-discretion standard." *State v. Parham*, 10th Dist. Franklin No. 16AP-826, 2019-Ohio-358, ¶ 20.[3] An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980). Because Lucas expressly opposed the joinder of Indictment #2 with Indictments #1 and #3 on Crim.R. 8(A) grounds prior to their joinder, abuse-of-discretion review is appropriate as to Lucas's Crim.R. 8(A) arguments. *See Parham* at ¶ 20.

**{¶49}** However, regarding Lucas's Crim.R. 14 arguments, Lucas did not renew his objection to the trial court's denial of severance at the end of the State's evidence or at the close of all the evidence. As a result, Lucas forfeited all but plain error with respect to his Crim.R. 14 arguments. *Parham* at ¶ 21; *State v. York*, 3d Dist. Union No. 14-21-14, 2022-Ohio-1626, ¶ 28.

**{¶50}** For plain error to apply, the trial court must have deviated from a legal rule, the error must be plain, i.e., an obvious defect in the proceeding, and the error must have affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "[T]o demonstrate that the trial court's error affected a

---

[3] The opinion in *Parham* suggests that a trial court's decision to join multiple indictments is generally reviewed for abuse of discretion, regardless of whether the defendant relied on Crim.R. 8(A), Crim.R. 14, or both to oppose joinder. However, we have previously stated that "'[w]hether charges were misjoined in a single indictment in contravention of Crim.R. 8(A) is an issue of law that this court reviews de novo.'" *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 77, quoting *State v. Jeffries*, 1st Dist. Hamilton No. C-170182, 2018-Ohio-2160, ¶ 51. It could be argued, then, that the same de novo standard should apply when reviewing a trial court's determination that Crim.R. 8(A) permitted joinder of separate indictments. We need not resolve this issue here, though, as the outcome of this case would be the same under either standard. For purposes of this case, we will follow the path already cut by the court in *Parham* and apply an abuse-of-discretion standard.

substantial right, the defendant must establish that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise." *State v. Sutton*, 3d Dist. Seneca No. 13-21-11, 2022-Ohio-2452, ¶ 50. We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**ii. The trial court did not abuse its discretion by joining Indictment #2 with Indictments #1 and #3 pursuant to Crim.R. 13 and 8(A).**

{¶51} Lucas argues that it was not proper to join Indictment #2 with the other indictments because "[t]he manslaughter case is not of same or similar character or based upon [the] same act or transaction as the trafficking and possession cases." However, Crim.R. 8(A) permits joinder where the multiple offenses are based on two or more acts "constituting parts of a common scheme or plan" or are "part of a course of criminal conduct." Here, Lucas was engaged in drug trafficking and drug possession in Allen County from at least March 2019 through his arrest in September 2020. The numerous drug-possession and drug-trafficking offenses charged in Indictments #1 and #3 stem from that course of conduct. Gerdeman's death was closely tied to Lucas's broader scheme of drug trafficking and drug possession in Allen County in that Gerdeman's death was a direct and foreseeable consequence of Lucas's decision to sell drugs to Peoples-Fuqua. Thus, the involuntary-manslaughter and corrupting-another-with-drugs offenses charged in

Indictment #2 were an offshoot of the same course of conduct underlying the offenses charged in Indictments #1 and #3. Accordingly, we conclude that Indictment #2 was not misjoined with Indictments #1 and #3 in contravention of Crim.R. 13 and 8(A). *Compare State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶ 81 (drug-possession, drug-trafficking, corrupting-another-with-drugs, and involuntary-manslaughter charges relating to pattern of drug crimes committed between August 2015 and April 2016 were properly joined for trial as "part of a common scheme or plan related to the sale of drugs").

### iii. The trial court did not commit plain error by keeping the three indictments joined despite Lucas's protestations of prejudice.

{¶52} As indicated above, the defendant has the burden of showing prejudice from the joinder of offenses under Crim.R. 13 and 8(A). However, the State can refute a defendant's claim of prejudicial joinder by demonstrating either of the following: (1) that the evidence to be introduced relative to one offense would be admissible in the trial on the other, severed offense, pursuant to Evid.R. 404(B) (the "other-acts" test); or (2) that, regardless of the admissibility of such evidence, the evidence relating to each charge is simple and direct (the "joinder test"). *State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 74. Importantly, the two tests are disjunctive—the satisfaction of one negates an accused's claim of prejudice *without consideration of the other*. *State v. Truss*, 10th Dist. Franklin No. 18AP-147, 2019-Ohio-3579, ¶ 17. Thus, "[i]f the state can meet the joinder test, it

-31-

need not meet the stricter 'other acts' test." *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000).

**{¶53}** Generally, "[e]vidence meets the simple-and-direct standard [of the joinder test] if it is straightforward and uncomplicated enough that the jury can segregate the proof required for each offense." *Parham*, 2019-Ohio-358, at ¶ 27, citing *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 52. "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

**{¶54}** Here, the offenses charged in Indictment #2 occurred months after the offenses charged in Indictment #1 and months before the offenses charged in Indictment #3. Moreover, the location of the offenses charged in Indictment #2 (i.e., the Travelodge Motel) differed from the location of the offenses charged in Indictments #1 and #3 (i.e., various residential addresses in Lima). In addition, there was no overlap between the witnesses who testified regarding the offenses charged in Indictment #2 and those who testified regarding the offenses charged in Indictments #1 and #3. Bryant, one of the State's key witnesses concerning many of the offenses charged in Indictment #1, offered no testimony relating to Gerdeman's death, and Peoples-Fuqua, Knuckles, and Florence—the State's main

witnesses concerning the circumstances of the offenses charged in Indictment #2—offered no testimony relating to the drug-trafficking and drug-possession offenses charged in Indictment #1. Furthermore, the law enforcement officers who investigated the offenses charged in Indictments #1 and #3 and testified about their investigations were entirely different from the officers who testified about the offenses charged in Indictment #2, and vice versa.

**{¶55}** Given the particulars of the offenses charged in Indictments #1, #2, and #3 and the evidence offered to prove the offenses, we are confident that the jury could segregate the proof for each offense and that there was little chance that the jury would confuse and conflate the proof offered for the offenses charged in Indictments #1 and #3 and the proof offered for the offenses charged in Indictment #2. Therefore, we conclude that the evidence was simple and direct. *See State v. Travis*, 11th Dist. Trumbull Nos. 2018-T-0101 and 2018-T-0102, 2020-Ohio-628, ¶ 73 (observing that "[t]he different victims, the different locations, and the different times support a finding that the evidence of each crime was simple and direct"); *State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 97 (holding that evidence of multiple offenses was "separate and direct" where the defendant "shot two different victims, at different locations, on different dates" and "[d]ifferent witnesses witnessed each of the shootings and separate police officers from separate police departments investigated the two shootings").

**{¶56}** We also note that the trial court instructed the jury that "[y]ou must consider each count and specification and the evidence applicable to each count and specification separately and you must state your findings as to each count and specification uninfluenced by your verdict as to any other count or specification." (Aug. 30-Sept. 2, 2021 Tr. at 1088). "Courts have held that any prejudice that results from the joinder of offenses is minimized when a trial court cautions a jury before deliberations to consider each count, and the evidence applicable to each count separately, and to state its findings as to each count uninfluenced by its verdict on any other counts." *State v. Freeland*, 4th Dist. Ross No. 12CA3352, 2015-Ohio-3410, ¶ 16.

**{¶57}** Nevertheless, Lucas maintains that he was prejudiced by the joinder of Indictment #2 with Indictments #1 and #3 because "by presenting all three cases together, the prosecution was able to gain an unfair advantage from the cumulative effect of all three allegations." He further argues that, unlike the evidence supporting the offenses charged in Indictments #1 and #3, the evidence supporting the offenses charged in Indictment #2 was "weak."

**{¶58}** Neither claim is accurate. This was not a case where the State "attempt[ed] to prove one case simply by questionable evidence of other offenses." *State v. Jamison*, 49 Ohio St.3d 182, 187 (1990). Instead, the testimony of multiple witnesses, including Peoples-Fuqua, Knuckles, and Florence, the physical evidence

recovered at the Travelodge Motel, subsequent forensic analyses, and Lucas's video-recorded admission that he gave drugs to Peoples-Fuqua—none of which were relevant to any of the offenses charged in Indictments #1 or #3—overwhelmingly established that Lucas furnished drugs to Gerdeman and that Gerdeman died as a result of ingesting those drugs. The only debatable issue was whether Lucas knowingly furnished the drugs to Gerdeman, but as we determined under Lucas's first assignment of error, the evidence was sufficient to support such a finding. Even if the jury were entirely unaware that Lucas had trafficked and possessed drugs both prior to and after Gerdeman's death as alleged in Indictments #1 and #3, considering the evidence presented at trial, the jury still could have easily found Lucas guilty of the offenses charged in Indictment #2. Therefore, "not only was [the evidence] direct and uncomplicated as to [the] indictment, but it also was amply sufficient to sustain [the] verdict, whether or not the indictments were tried together." *Torres*, 66 Ohio St.2d at 344. This too undermines Lucas's claim of prejudice.

{¶59} Finally, Lucas claims that he was prejudiced by the joinder of Indictment #2 with Indictments #1 and #3 because he "had wished to testify in his own defense on the manslaughter case, but not on the trafficking/possession cases," and was deprived of the opportunity to do so when the three indictments were joined. To show that he would be prejudiced by joinder, Lucas had to "make a

convincing showing that he ha[d] important testimony to give concerning one cause, and a strong need to refrain from testifying in the other." *State v. Roberts*, 62 Ohio St.2d 170, 176 (1980). Lucas was required to "produce sufficient information regarding the nature of his testimony he wishe[d] to give in the one case, and his reasons for not wishing to testify in the other, so as to satisfy the court that his claim of prejudice [was] genuine." *Id.*

{¶60} In his memorandum in opposition to the State's motion for joinder, Lucas asserted:

> In the case at bar, the Defendant may desire to testify regarding certain offenses but not regarding others. The Defendant has provided law enforcement with an explanation of his involvement on some counts but may wish to provide the jury deciding [the involuntary-manslaughter] count an explanation. As to other counts, the Defendant may wish to remain silent and put the state to its proof. Furthermore, by remaining silent on these other counts, the Defendant will not be required to expose his prior criminal record to a jury. The Defendant's desire to remain silent and keep his prior criminal record from being considered by a jury is a compelling reason not to testify regarding these counts.

(Case No. CR2020 0375, Doc. No. 45). Lucas also referred to "the possibility of [his] testimony on some but not all charges." (Case No. CR2020 0375, Doc. No. 45). However, at the May 17, 2021 hearing on the State's motion for joinder, there was no mention of Lucas's purported wish to testify concerning only some of the charges.

**{¶61}** The representations in Lucas's memorandum in opposition fell far short of the "convincing showing" that was required of Lucas. To begin, Lucas never expressed a clear and concrete desire to limit his testimony. "[T]he mere possibility that [the defendant] might desire to testify on one count and not on the other[s] * * * is insubstantial and speculative; it is not sufficient to show prejudice." *Torres*, 66 Ohio St.2d at 344. Furthermore, while Lucas offered an explanation for potentially not wanting to testify concerning some of the charges (i.e., wanting to put the State to its proof and preventing the jury from learning about his prior criminal history), he failed to provide the trial court with any information regarding the nature of the testimony he wanted to give concerning the involuntary-manslaughter offense charged in Indictment #2. As a result, Lucas did not provide the trial court with anything to determine the genuineness of his claim.

**{¶62}** For all the foregoing reasons, Lucas has failed to demonstrate that he was prejudiced by the trial court's failure to sever Indictments #1 and #3 from Indictment #2, which had otherwise been properly joined with Indictments #1 and #3 pursuant to Crim.R. 13 and 8(A). Thus, we conclude that the trial court did not commit plain error.

**{¶63}** Lucas's third assignment of error is overruled.

## IV.  Conclusion

{¶64} For the foregoing reasons, Lucas's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the Allen County Court of Common Pleas.

***Judgments Affirmed***

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**